UNITED STATES of America,
Plaintiff-Appellee,

v.

Gordon Byron FERGUSON, Defendant-
Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas Norwood STREET, Jr.,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Louis DICKINSON, Defendant-Appellant.

Nos. 73-1124 to 73-1126.

United States Court of Appeals,
Sixth Circuit.

Argued June 15, 1973.

Decided Oct. 24, 1973.

Bernard W. N. Chill, Jackson, Miss., for Gordon Byron Ferguson.

Alvin M. Binder, Jackson, Miss., for Gordon Byron Ferguson; Binder, Lucas, Tharpe & Lohrman, Jackson, Miss., of counsel.

Edward G. Grogan, Memphis, Tenn., for Louis Hobson Dickinson; Heiskell, Donelson, Adams, Williams & Wall, Memphis, Tenn., of counsel.

James S. Cox, Memphis, Tenn., for Thomas Norwood Street; Krivcher & Cox, Memphis, Tenn., of counsel.

Thomas F. Turley, Jr., U. S. Atty., J. N. Raines, Asst. U. S. Atty., W. D. Tenn., Memphis, Tenn., for appellee.

Before MILLER and LIVELY, Circuit Judges, and CECIL, Senior Circuit Judge.

WILLIAM E. MILLER, Circuit Judge.

The appellants were convicted under 18 U.S.C. § 1341 of using the United States mails to defraud certain banks. (The offense is commonly referred to as "check kiting"). They now appeal and contend, inter alia, that the conviction should be set aside because an improper communication with a juror tainted the verdict. Because of our decision on this issue, we do not reach the other claims advanced by the appellants.

Shortly before the noon recess of the second day of trial, June 27, 1972, counsel for one of the appellants, Louis Dickinson, advised the court in chambers that his client had received a telephone call from a friend who had spent a portion of the previous evening with one of the jurors, Ronald Austin. The attorney said that one Ted Cruchon had called Dickinson that morning and said, "Louis don't [sic] have anything to worry about. He [Austin] had this thing all figured out that he knew who the heavy was."

Following the recess the court questioned Austin in chambers, out of the presence of counsel, but with a court reporter. Austin said that he and his wife had been, on the previous evening, at the home of Cruchon, a mutual friend of theirs and Dickinson. The trial had been briefly discussed, with Cruchon doing most of the talking. Counsel were then brought into chambers and Austin was requested to repeat what he had already told the court. He elaborated, saying that Cruchon had called him at around 9:30 P.M. and invited him over for a drink. He and a friend (not his wife as he had stated earlier) went to Cruchon's house for approximately two hours, but discussed the case for no more than ten to twelve minutes. Austin insisted that he had not spoken to any juror about his conversation of the evening before. "I have not said one word of what was said last night to any juror." Following Austin's statements, counsel for appellants moved for a mistrial, which was denied. Austin was excused from the jury.

The jury was brought into the courtroom, and the court explained the situation as follows:

Now, I asked Mr. Austin to come out of the jury room and in conference with him, without [453] going into all of the various circumstances, he had occasion to have a social contact with a person that knew one of the defendants and this—in the course of the conversation the fact that Mr. Austin was serving on the jury was mentioned, and we have not gone into the exact words that were said, had a trial about that, but it was sufficiently— the appearance of it was sufficiently awkward that I felt that I should excuse Mr. Austin and I now need to be— to ask you jurors individually if anything has been said in the jury room that suggests to anybody, each of you have discussed any phase of the case at this point with regard to the guilt or innocence of the defendants.

\* \* \* \* \* \*

Now, I don't want to give the impression that the Court is mad at anybody but it is my heavy responsibility to see that we, when going forward with the trial, to see that we follow [454] the rules and sometimes just the appearance of something causes us concern and, of course, we have a trial that is going now and we don't want to stop and have another one.

Next the jury was polled, the court asking two questions of each juror:

[Whether] any juror has discussed the guilt or innocence of any one of the defendants in the jury room or with another juror outside of the jury room discussed with other jurors; and, second, if you as a juror have already made up your mind [455] about the guilt or innocence.

The sixth juror polled, Mr. Hampton, said that he had heard a remark of another juror about the case. The rest of the jury was then excused so that Hampton could be questioned further. He recalled Austin saying to him on the day before:

"Hell, everybody writes a check on Thursday and they hadn't got the money to cover it until Friday, so they just go ahead and write it when they go to the grocery store," and I think, "They write the Thursday night and get their groceries and Friday deposit the money in the bank."

And earlier that day, on the way back from lunch, Austin had invited Hampton and juror Wayne Jordan to take a walk with him in the park. During their conversation Austin said, "The government really hadn't made a case yet." Hampton

assured the court that the incident had neither influenced his opinion nor caused him to make any decision on the issues that would be put to the jury. He was allowed to remain on the jury, and the polling continued. All of the other jurors, including Jordan, denied either having heard or participated in any discussion about the case.

New motions were made for a mistrial and denied. An alternate was substituted for Austin; and the trial proceeded, eventually resulting in the conviction of the defendants. Subsequently, motions were made for a judgment notwithstanding the verdict, a new trial and leave to conduct a post-verdict interrogation of jurors. Only the last of these motions was granted.

At the interrogation of jurors on September 29, 1972, Austin testified that he went alone to Cruchon's house and there met Cruchon, his wife and another person named Bill Yancy. When asked why he had earlier said that he had gone with a friend, Austin replied that he must have misunderstood the question. Yancy was the person to whom he had referred.

Austin admitted that he knew that Cruchon and the defendant, Dickinson, were in the bond business together and that they [Cruchon and Dickinson] had worked for the same company at one time. He also understood that the two men were good friends on a social basis. Austin recalled walking in the park with Hampton and another juror, but he could not remember whether they had discussed the case. Neither could he remember explaining check kiting to Hampton.

Mrs. Dickinson, wife of the defendant, testified that Cruchon called their home at approximately 7:00 A.M. on June 27, 1972. When she answered the telephone Cruchon identified himself and said, "Betty, I've got good news for you." He continued, "You don't have anything to worry about, one of the jurors is a good friend of mine, and he was over at my house last night." At this point Mr. Dickinson talked to Cruchon.

Finally on November 3, 1972, Ted Cruchon was called to testify. He confirmed that he was a friend of both Dickinson and Austin, seeing the latter socially on the average of once a week. On the evening of June 26, 1972, Austin had been in his house and Dickinson's trial was discussed. During the course of the conversation, Cruchon's wife asked her husband to explain check kiting. He repeated the example as follows.

Q. Would you tell His Honor—well, what explanation [12] did you give her, what words did you say? A. I used the grocery store example.

A. I see. Would you give us the example? A. As far as writing checks and not getting paid until, say, for instance, write a check on Monday and not get paid until Monday and you beat them to the bank.

Mrs. Cruchon later reiterated that same example in the conversation with Yancy and Austin. She also commented favorably on the Dickinson children.

Cruchon explained his conversation of the next morning with the Dickinsons:

Q. All right. Now, why did you make that phone call to Mr. Dickinson? A. I called him because a couple of times in the conversation, not directly with me, but other people, just in the office like I think was the main time, I remember he was always concerned, it was my opinion, of jurors.

Q. Uh-huh. A. (Continuing) He was always concerned with them for some reason, I felt like if they knew his position of check kiting would be a lot better off. That's the reason I called him, I was easing his mind, I thought in this respect that someone I knew that was in the business world knew at least what check kiting was.

After Cruchon's testimony, the court ruled from the bench on the motions for a new trial and a judgment notwithstanding the verdict. Both were denied. The court found that although Austin's con-

duct was improper, it did not prejudice the jury. His "grocery store" example was said to be an "innocuous remark" and not one that could have affected any jurors. Finally, the court noted that the evidence clearly established a "deceitful scheme" on the part of the defendants. In that context "Mr. Austin's remark could not have been the only source of establishing the fact of check kiting."

In Stone v. United States, 113 F.2d 70 (6th Cir. 1940), this Court reviewed the conviction of a defendant who alleged that the jury was tainted because of an improper communication made to one of its members. A person, not acting at the request of the defendant, attempted to bribe a juror. The juror reported the incident, and when questioned, said that he could decide the case on the evidence as though the bribe attempt had not occurred. He also swore not to relate his experience to the other jurors. Subsequently, the court questioned each juror, except the one contacted, on whether anything had happened that might have prejudiced them or whether anyone had either discussed the case or attempted to influence them. After each had answered no, the court reiterated to all that it understood that no one had contacted any juror or made any statement about the case in their presence. Upon conviction there was a motion for a mistrial which was denied.

We reversed on the basis that once an improper communication has been made to a juror, there is a presumption that the rights of the defendant are prejudiced. *See* Mattox v. United States, 146 U.S. 140, 13 S.Ct. 150, 36 L.Ed. 917 (1892). The burden was on the government to show that no prejudice resulted from the communication. Our insistence on this high standard was necessary, not only to insure that the defendant received a fair trial by impartial jurors, but also to maintain the integrity of the jury system. Inherent in our scheme of justice is the assumption that litigants will have faith in the probity of jury verdicts. Absent such faith the stability on which we depend for the orderly functioning of our legal institutions would be in doubt. As we said in *Stone*:

> The question is, not whether any actual wrong resulted from the conversation . . . with the juror . . . but whether it created a condition from which prejudice might arise or from which the general public would suspect that the jury might be influenced to reach a verdict on the ground of bias or prejudice. When the judgment is weak, prejudice is strong, and it is essential to faith in the jury system that jurors should determine the facts submitted to them wholly on the evidence offered in open court, unbiased and uninfluenced by anything they may have seen or heard outside of the actual trial of the case. 113 F.2d at 77.

The district court, in its ruling from the bench, indicated that it did not believe that there should be a presumption of prejudice in this case because Austin was removed from the panel and not allowed to participate in the decision; whereas, the contacted juror in *Stone* remained on the jury. The court has correctly pointed to differences that exist between *Stone* and the present case. The differences, however, do not in any way alter the applicability to our current inquiry of the principles which we laid down in *Stone*. Certainly a showing that the contacted juror was removed from the jury before he had the opportunity to discuss the case with other members of the panel would be some evidence that no prejudice occurred. Yet it would not so change the inquiry that there should no longer be a presumption of prejudice.

Austin, prior to his excusal from the jury, made at least two statements on the case to other jurors. He explained check kiting to Hampton in terms remarkably similar to those used by Cruchon. Then on the day after the discussion at Cruchon's home, he remarked to Hampton, possibly in Jordan's presence, that he did not believe that the government had proved its case. Although Hampton assured the court that he still had an open mind on the case, and we

have no reason not to believe that he made that statement honestly, we cannot ignore the fact that jurors are human beings, subject to the same suspicions, perhaps subconsciously, as all other persons. It is not unreasonable to believe that Hampton may have had his suspicions aroused that Austin's statements to him were related to Austin's excusal from the jury and indicative of a possible attempt by defendants to influence the jury improperly.

Similarly, as stated above, the other jurors saw Austin replaced and were told that it was because of a "social contact" with a friend of one of the defendants. The court said that it would not give the exact words spoken "but the appearance of it was sufficiently—that I felt that I should excuse Mr. Austin. . . ." He then polled the jury, excusing them when it became necessary to question Hampton out of their presence. We can only speculate on whether suspicions were formed that were later carried into the deliberations.

 The government introduced no evidence to overcome the presumption of prejudice and perhaps this would have been impossible. It argued that Austin's remarks were innocuous and would not, on their own, have caused a guilty verdict. Whatever irregularities did exist were said to be harmless and not injurious to appellants. Nevertheless, we are faced here with undisputed facts that a juror was improperly contacted from an outside source and that before being excused he improperly discussed the case with at least one other juror if not more. Under such circumstances it can hardly be said that the presumption is overcome. As indicated, the presumption, although rebuttable, is a rigid one because of its importance in protecting the jury system.

The district judge acted commendably in his attempts to eliminate any possible prejudice so that the trial could proceed. Unfortunately, the matter did not come to the attention of the court until after Austin had already discussed the case with other jurors. By then it was too late.

We find that the presumption of prejudice has not been overcome. Consequently we reverse and remand for a new trial.