Walter SHER, Petitioner,

v.

Donald STOUGHTON, Commissioner of Corrections, Onondaga County Correctional Facility, Jamesville, New York; Benjamin Ward, New York State Commissioner of Corrections, Respondents.

No. 77–CV–402.

United States District Court,
N. D. New York.

June 9, 1981.

As Amended June 10, 1981.

Seidenberg & Strunk, Syracuse, N. Y., for petitioner; Faith A. Seidenberg, Syracuse, N. Y., of counsel.

Denis Dillon, Dist. Atty. of Nassau County, Mineola, N. Y., for respondents; William C. Donnino, Bruce E. Whitney, Asst. Dist. Attys., Mineola, N. Y., of counsel.

## MEMORANDUM—DECISION AND ORDER

MUNSON, Chief Judge.

On October 31, 1980, this Court granted the petitioner's application for a writ of habeas corpus, finding that the petitioner had been denied his right to a fair and impartial trial by jury and his right to confront all evidence against him, as guaranteed by the Sixth and Fourteenth Amendments. On March 5, 1981, the Second Circuit, 657 F.2d 264, vacated this Court's decision in light of the strictures imposed by *Sumner v. Mata*, —— U.S. ——, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) upon federal judicial review of state court findings of fact.

On remand, the Court shall take this opportunity not only to consider the Supreme Court's decision in *Mata*, but also to elaborate further the legal questions posed by the instant application. For the reasons set forth below, the Court again concludes that the petitioner's application should be granted.

### I.

As developed at trial, on April 5, 1962, Walter Sher, who was 23 years old, and Dominick Carbonaro entered Hansen's Jeweler's, in Manhasset, New York, with loaded guns. While Carbonaro stayed in the front of the store, Sher walked toward a back room, displayed a .38 caliber revolver, and said "This is a stickup." Sher ordered one of the proprietors, Edward Hansen, and two employees in the back room to lie down. At this time, Donald Hansen, the other proprietor and brother of Edward, left the area in the front of the store and moved toward Sher. Despite Sher's "screaming" that Donald Hansen should stay back, Donald Hansen and an employee seized Sher and struggled with him on the floor. In the meantime, Edward Hansen ran to the front of the store and grappled with Carbonaro. Two shots went off from Sher's gun, one of which fatally injured Donald Hansen. Carbonaro, in turn, shot and wounded Edward Hansen and the employee, who, with Donald Hansen, tried to overtake Sher. . Both Carbonaro and Sher then fled from the scene in an automobile, and two days later were arrested in a New York City apartment.

Sher and Carbonaro were indicted for felony murder, First Degree Murder, and other crimes on April 13, 1962. Both defendants pled not guilty. After a hearing before the County Court, Nassau County, Sher was found to be incapable of understanding the charges against him and of assisting in his defense, and thus unable to stand trial. As evidenced by later testimony, it appears that both Sher and members of his family have histories of psychotic behavior. Sher was committed to Matteawan State Hospital for the criminally insane. Meanwhile, Carbonaro was tried separately, and subsequently convicted of felony murder and other offenses. He was sentenced to death on October 4, 1963.

On July 23, 1963, Sher was ordered returned from Matteawan. His trial by jury began on October 8, 1963, before Justice Edwin R. Lynde, of the Supreme Court, Nassau County. Sher's principal defense was insanity. At the completion of the prosecutor's case in chief, however, and during the evening of October 24, 1963, a total of six jurors received telephone calls at their residences from an unidentified woman who stated *inter alia*, that Sher was a vicious killer and should be sentenced to die, and that the jury should disregard evidence produced to establish Sher's insanity. Two of these jurors did not speak directly with the woman. In this regard, one juror who spoke with the woman telephoned another juror who had not received any call, and informed him of the substance of the conversation. The next morning, on October 25, 1963, the jurors returned to court, and, with the exception of one alternate juror, all of the jurors and alternates, discussed or heard discussed the substance of the telephone calls. The jurors had been instructed not to discuss the trial among themselves. The clerk of the court was also informed of the conversations. When the trial judge learned of the events of the previous evening, he called the jurors and alternate

jurors individually into his chambers, and questioned each of them. The respective counsel and the defendant were present, but did not participate in the questioning. The record reveals the following specific information about these in chambers proceedings and about the telephone calls. *See* Rec. at 538–62.

The four jurors who spoke directly with the woman reported similar types of communications. Mr. Gordon Kinsey, one of the jurors, stated that an unidentified woman had urged him to disregard the arguments of Sher's attorney and find Sher guilty. Rec. at 539. Mr. Edward Yasko, another juror, stated that a woman had told him to encourage other jurors "to vote for the electric chair" and to ignore any testimony concerning insanity. Rec. at 540. This juror also revealed that he had discussed this conversation with another juror, Mr. Robert Kirschenheiter, the preceding evening, and with other jurors that morning. Rec. at 541. He was not asked what he had told the other jurors. The third juror, Mr. Charles Guest, reported that the woman had said that Sher must be found guilty. Rec. at 545. Mr. Guest also informed the trial judge that he had "compared" the subject matter of his telephone call with the communications received by other jurors. Rec. at 546. The fourth juror, Mr. William Nachbar, noting that the unidentified woman seemed to be reading, told the judge that the woman referred to Sher as a "vicious killer with a past record" who should be "sent to the chair," and stated to him that Sher's co-felon had been sentenced to death. Rec. at 549. Mr. Nachbar was not asked whether he had discussed his telephone conversation with other jurors.

Two other jurors also received telephone calls, but neither individual spoke directly with the woman. One of these jurors, Mr. Ernest Smoker, stated that he did not discuss the matter with other jurors. Rec. at 543. No inquiry was made of him as to whether his wife, who had answered the telephone, had reported to him what, if anything, the woman had said. The other juror, Mr. William Frye, overheard discussions that morning of the substance of one of the conversations. Specifically, Mr. Frye learned that another juror had been told that Sher was a "vicious character" and that the jury should ignore his plea of insanity. Rec. at 547.

The examinations of the jurors who had received no telephone calls supply additional information. Three jurors, who apparently had learned information regarding Mr. Nachbar's call, said that they understood that an anonymous woman telephone caller had referred to Sher as a "vicious killer." Rec. at 544 (Joseph Rollo); Rec. at 554 (Charles Shaw); Rec. at 555 (George Lee). One of these jurors reported also that he had heard that the woman had told a juror to try to influence other jurors. Rec. at 554 (Charles Shaw). A fourth juror, Mr. Robert Kirschenheiter, said that he had spoken the previous evening with a juror who had received a telephone call, and that he had been told that the woman had urged the juror essentially to ignore Sher's defense and to encourage other jurors "to vote for the electric chair." Rec. at 551. Mr. Kirschenheiter also revealed to the trial judge that he had heard other jurors discuss the telephone calls that morning. A fifth juror, Mr. Robert McDougald, also stated that he had understood that a woman had told jurors to "vote for the death penalty." Rec. at 557. Two other jurors, Mr. James Krut and Mr. Gerard Cattone, believed that the woman had requested jurors to bring in verdicts of guilty. Rec. at 552; Rec. at 558. Mr. Krut and two additional jurors said that they thought the woman had told jurors to ignore the defense of insanity. Rec. at 552 (Krut); Rec. at 555 (George Lee); Rec. at 556 (Floyd Gianbalvo). Only one alternate juror, Mr. Thomas Seaman, stated that he had heard no discussions about the telephone calls. Rec. at 559.

After each juror related to the trial judge whether and what he had learned either directly or indirectly about the woman's conversations, the judge admonished them individually that the conversations were not evidence in the case, and that Sher was to be judged only upon the basis of evidence

adduced at trial. Each juror gave assurances that he would disregard information gleaned from the telephone calls or from discussions concerning the telephone calls.

Following the series of questioning, the district attorney stated that all the jurors appeared to share the same information, except Mr. Nachbar, "who apparently received the further message to the effect that Carbonaro was sentenced to the electric chair." Rec. at 560. For this reason, the district attorney stated that "if counsel for the defendant wished to specifically challenge this juror, I would not interpose any objection as to that particular juror." Rec. at 560. As to the other jurors, however, the district attorney asserted that these individuals would, as they stated, disregard the telephone calls, and that they would probably hear information in the trial that was the subject matter of the telephone calls, such as psychiatric evidence. Rec. at 560. In response to these comments, the defense attorney argued that he knew of no procedure to challenge a juror individually during the trial, and that the only ground for replacing a juror with an alternate juror is in the event of illness or some other inability to serve. Rec. at 561. Thus, the defense attorney made a motion, on two occasions, "for the withdrawal of a juror and the declaration of a mistrial." Rec. at 560, 561. The trial judge denied this motion without explanation.

The jury found Sher guilty of felony murder and other offenses on November 21, 1963, thus rejecting Sher's defense of insanity. In a separate proceeding, the jury recommended on November 23, 1963, that Sher be sentenced to die for the murder of Donald Hansen. Consistent with the jury's recommendation, the trial judge issued a Death Warrant on December 13, 1963, ordering that Sher be executed during the week of January 27, 1964.

On direct appeal to the New York Court of Appeals, Sher challenged his conviction on several grounds, one of which concerned the trial judge's denial of his motion for a mistrial. In a 4–3 per curiam decision, the New York Court of Appeals affirmed Sher's conviction on April 17, 1969. *People v. Sher*, 24 N.Y.2d 454, 248 N.E.2d 887, 301 N.Y.S.2d 46 (1969). The Court's discussion regarding this question was brief:

> The [trial] incident resulted in no palpable prejudice to the defendant since each of the jurors during the trial was questioned whether he could sit impartially and confine his verdict to the record evidence, and each answered in the affirmative, despite the telephone calls to Nachbar and others of the jury. This was after each related his own telephone conversations with the anonymous caller and with his fellow jurors. This cures the possible harm under the accepted [state] precedents because the questioning of the jurors and the admonition to them serve a real purpose in drawing their attention to the unfairness of their considering anything but the record of evidence.

*Id.* at 457, 248 N.E.2d at 888, 301 N.Y.S.2d at 47–48. In this regard, the Court went on to characterize Mr. Nachbar as a juror "to whom the only really seriously unfavorable communications were made," noting that Mr. Nachbar had told the trial judge that he could serve impartially:

> If I may say so, Judge, this incident has done only one thing to me: It has strengthened my resolve to be completely impartial and to be governed by the evidence alone. There was no evidence given me at all yesterday, nothing whatsoever, that could be called evidence. It was just somebody's urging to do certain things.

*Id.* at 457–58, 248 N.E.2d at 888, 301 N.Y.S.2d at 48.

Thereafter, Sher was ordered to be executed during the week of June 2, 1969. On May 9, 1969, however, New York Governor Nelson Rockefeller granted an executive clemency, changing Sher's sentence to life imprisonment. By statute, N.Y.Exec.Law § 259–h, Sher's sentence was modified in 1977 to an indeterminate sentence of imprisonment for a period of not less than twenty years, and not to exceed life.

From the decision of the New York Court of Appeals, Sher sought review in the Su-

preme Court, arguing that the trial judge's failure to declare a mistrial denied his right to an impartial jury and his right to confront and cross-examine, as secured by the Sixth and Fourteenth Amendments. On October 13, 1969, the Supreme Court denied certiorari. *Sher v. New York*, 396 U.S. 837, 90 S.Ct. 96, 24 L.Ed.2d 87 (1969).

On January 26, 1970, Sher filed a pro se habeas corpus petition in the United States District Court for the Eastern District of New York before the Hon. Anthony J. Travia. In his petition Sher again argued that the trial judge's failure to grant his motion for a mistrial denied him rights under the Sixth and Fourteenth Amendments. Without conducting a hearing, Judge Travia on June 25, 1970, denied Sher's application for a writ of habeas corpus. *United States ex rel. Sher v. LaVallee*, 70–C–124 (E.D.N.Y. June 25, 1970) (Travia, J.). The judge rested his decision on essentially three grounds. First, he concluded that the individual inquiries made by the trial judge immediately upon learning of the incident and during the trial, the corrective instructions given by the judge, and the assurances of the jurors eliminated the possibility of substantial prejudice. Second, the judge noted, without explanation, that much of the substance of the telephone calls was similar to information and arguments disclosed at trial. Finally, the judge found that Mr. Nachbar was the only juror to whom the woman had revealed information inadmissible at trial. Because, however, the defendant's attorney did not seek the removal of Mr. Nachbar, Sher could not now rest a federal post-conviction challenge upon the trial judge's failure to declare a mistrial.

On July 27, 1970, Judge Travia denied a certificate of probable cause to appeal from his denial of a writ of habeas corpus, for the reasons set forth in his earlier decision. The Second Circuit denied a certificate of probable cause on January 12, 1971, and the Supreme Court denied certiorari on October 12, 1977. *Sher v. LaVallee*, 404 U.S. 834, 92 S.Ct. 118, 30 L.Ed.2d 65 (1971).

Sher then filed the instant habeas corpus petition before this Court on September 19, 1977, arguing once more that the trial judge's denial of his motion for a mistrial violated his rights under the Sixth and Fourteenth Amendments. The Court referred the matter to Magistrate John P. McLane on October 4, 1977, and the Magistrate issued his Report and Recommendation on March 31, 1978. In his Report, the Magistrate effectively concluded that the second petition should be dismissed because the matter had been fully presented to Judge Travia, and because the passage of time since Sher's conviction would unduly prejudice the State's case. On the merits, the Magistrate expressed his agreement with the actions of the New York Court of Appeals and of Judge Travia, noting implicitly that the trial judge had correctly denied the defendant's joint motion for the withdrawal of a juror, whom the Magistrate believed to be Mr. Nachbar, and for a mistrial.

The Court, however, did not share the position of the able Magistrate, finding, as a matter of record fact in the October 1, 1980 order that "when defense counsel moved for the withdrawal of a juror, he was not . . . referring to Mr. Nachbar, but was merely requesting the Court to have a juror—any juror—step down." Then, the Court went on to rule, as a matter of law, that once one juror, any juror, would have stepped out of the jury box, a mistrial would necessarily have been declared because there would have been only eleven jurors in the jury box. In this regard, with the exception of only one alternate juror, all the remaining jurors and alternate jurors had heard conversations concerning the telephone calls. Thus, no matter how one sliced the cake, a jury of twelve impartial jurors would not have presided, and in fact did not preside, over Walter Sher's trial. In reaching this holding, the Court rejected the respondents' arguments that this second federal habeas corpus petition should have been dismissed.

The Court shall now turn to the present claims.

## II.

As a procedural matter, the respondents renew their argument that inasmuch as the merits of Sher's first petition were reached, this second petition should be dismissed as a successive petition, pursuant to Rule 9(b) of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254. Furthermore, the respondents contend that the interests of justice tip in their favor, given the lapses of time between Sher's conviction, the first petition, and the instant petition. Sher, on the other hand, argues that the Court is not required to dismiss his second petition, but is merely given the power to do so. Additionally, Sher maintains that where a petitioner is uneducated, receives no hearing during the prior proceeding for the purpose of developing crucial facts, and appears without counsel in support of his prior petition, a subsequent petition must be determined on the merits, even if it raises claims presented in the earlier petition.

It is true that a district court may refuse to entertain a successive application for a writ of habeas corpus if the previous application contained the same claims, if the prior disposition was on the merits, and if the ends of justice would not be served by considering the merits of the subsequent application. *See* Rule 9(b) of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254; *Sanders v. United States*, 373 U.S. 1, 15, 83 S.Ct. 1068, 1077, 10 L.Ed.2d 148 (1963); *Potts v. Zant*, 638 F.2d 727, 739 (5th Cir.) *pet. for cert. filed* April 18, 1981 (80–1751), 49 U.S.L.W. 3808 (April 28, 1981); *United States ex rel. Lewis v. Henderson*, 520 F.2d 896, 904 (2d Cir.), *cert. denied*, 423 U.S. 998, 96 S.Ct. 429, 46 L.Ed.2d 373 (1975). *See also* 28 U.S.C. § 2244(a); *Sacco v. United States Parole Commission*, 639 F.2d 441, 442 (8th Cir. 1981); *United States ex rel. Schnitzler v. Follette*, 406 F.2d 319, 321 (2d Cir.), *cert. denied*, 395 U.S. 926, 89 S.Ct. 1783, 23 L.Ed.2d 244 (1969). The exercise of such judicial power lies generally in the sound discretion of the judge. *See Sanders v. United States*, 373 U.S. at 15, 83 S.Ct. at 1077; *Matthews v. Wingo*, 474 F.2d 1266, 1268 (6th Cir.), *cert. denied*, 411 U.S. 985, 93 S.Ct. 2283, 36 L.Ed.2d 963 (1973). *See also Silverton v. Department of Treasury*, 640 F.2d 214, 218 (5th Cir. 1981); *United States ex rel. Townshend v. Twomey*, 452 F.2d 350, 353 (7th Cir. 1971), *cert. denied*, 409 U.S. 854, 93 S.Ct. 190, 34 L.Ed.2d 98 (1972); *United States ex rel. Schnitzler v. Follette*, 406 F.2d at 321. If, however, "the ends of justice demand," the judge has a "duty to reach the merits" of a second petition. *Sanders v. United States*, 373 U.S. at 19, 83 S.Ct. at 1079. *See Polizzi v. United States*, 550 F.2d 1133, 1135 (9th Cir. 1976). In this regard, the "ends of justice" necessarily includes such factors as whether the petitioner had the benefit of counsel at the time of his first petition, *see also Haley v. Estelle*, 632 F.2d 1273, 1276 (5th Cir. 1980); *United States ex rel. Lewis v. Henderson*, 520 F.2d at 904 & n. 8; *Tucker v. United States*, 427 F.2d 615, 617–18 & n. 13 (D.C. Cir. 1970), whether there has been an intervening change in the law, *see, e. g., Sanders v. United States*, 373 U.S. at 16–17, 83 S.Ct. at 1077–1078; *United States ex rel. Townshend v. Twomey*, 452 F.2d at 354; *United States ex rel. Schnitzler v. Follett*, 406 F.2d at 321, and whether the relevant facts have been fully developed, *see, e. g., United States ex rel. Townshend v. Twomey*, 452 F.2d at 354; *United States ex rel. Schnitzler v. Follette*, 406 F.2d at 321.

With respect to the instant application, this Court is satisfied that the interests of justice demand that the merits of this petition be reached. Not only, as noted in the earlier decision in this matter, was the petitioner without counsel at the time of his first petition, but also, as will be discussed at length below, the law has undergone a radical change since the consideration of the prior petition. Notwithstanding the possible prejudice to the state prosecution by virtue of this Court's consideration and resolution of the petition, the Court cannot, and shall not, ignore the fact that the petitioner faced a death sentence, and now faces a maximum sentence of life imprisonment, of which he has already served almost twenty years, for his actions.

For these reasons, and in the absence of any particularized showing by State officers of prejudice, see *Paprskar v. Estelle*, 612 F.2d 1003, 1007–08 (5th Cir.) *cert. denied*, —— U.S. ——, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980), the Court is inclined to find that the interests of justice tip in favor of the petitioner.

### III.

The threshold issue that this Court must now address concerns the applicability of *Sumner v. Mata, supra*, to the disposition of Sher's petition for a writ of habeas corpus.

### A.

In *Mata v. Sumner*, 611 F.2d 754 (9th Cir. 1979), the Ninth Circuit reversed the denial of a petition for a writ of habeas corpus, which had been filed pursuant to 28 U.S.C. § 2254. Contrary to the opinion of the state courts, the Ninth Circuit concluded that an impermissively suggestive photographic identification had prejudiced the petitioner's murder trial, and that the continued state custody of the petitioner was hence unlawful. In this regard, while the state appellate court had found, *inter alia*, that identification witnesses were under no influence by officers, that their descriptions were accurate, and that these persons had a sufficient opportunity to view the crime, the Ninth Circuit found that the witnesses were indeed under impermissible pressures from officials and that the descriptions lacked adequate detail. In making these findings, the Ninth Circuit made no elaboration of its rejection of the state appellate court's factual determinations.

On appeal, the issue before the Supreme Court was whether the strictures of 28 U.S.C. § 2254(d) applied to state appellate court findings of fact. In holding that they did, the Court ruled that the Ninth Circuit both failed to apply the "presumption of correctness" rule of 28 U.S.C. § 2254(d) to the state appellate court factual findings, and failed to set forth in writing the reasons why it disagreed with the factual determinations of the state court. For these reasons, the Supreme Court vacated the decision of the Ninth Circuit, and remanded the action for further consideration.

### B.

The effect of *Sumner*, and of § 2254(d), is clear: state court factual determinations are presumptively correct unless the petitioner demonstrates that such findings are suspect under one or more statutorily designated circumstances.

Also clear, however, is that the "facts" embraced by § 2254(d) are "basic, primary or historical facts" only. *See Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980); *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963) (precursor of § 2254(d)). The statute contains no requirement that a federal court must presume the correctness of state court findings of law.

> Although the district judge may, where the state court has reliably found the relevant facts, defer to the state court's findings of fact, he may not defer to its findings of law. It is the district judge's duty to apply the applicable federal law to the state court findings independently.

*Id.* at 318, 83 S.Ct. at 759. Nor does § 2254(d) apply to mixed questions of law and fact, which necessitate the "application of constitutional principles to the [basic] facts as found." *Brown v. Allen*, 344 U.S. 443, 507, 73 S.Ct. 397, 446, 97 L.Ed. 469 (1953) (Frankfurter, J.) (separate opinion), *quoted in Brewer v. Williams*, 430 U.S. 387, 403–04, 97 S.Ct. 1232, 1241–42, 51 L.Ed.2d 424 (1977). *See Cuyler v. Sullivan*, 446 U.S. at 342, 100 S.Ct. at 1714; *Townsend v. Sain*, 372 U.S. at 309 n. 6, 83 S.Ct. at 755 n. 6; *Gunsby v. Wainwright*, 596 F.2d 654, 655 (5th Cir.) *cert. denied*, 444 U.S. 946, 100 S.Ct. 307, 62 L.Ed.2d 315 (1979); *United States ex rel. Thomas v. New Jersey*, 472 F.2d 735, 737–38 (3d Cir.) *cert. denied*, 414 U.S. 878, 94 S.Ct. 121, 38 L.Ed.2d 123 (1973).

Under these principles, then, it is first important to identify the nature of the inquiries posed by the petitioner's arguments. The issue boils down to whether

this Court must ultimately address purely factual or legal issues, or mixed questions of law and fact. Fortunately, part of this identification task has already been done, inasmuch as the Supreme Court has ruled that the issue of jury partiality is a mixed question of law and fact. *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961); *Reynolds v. United States*, 98 U.S. 145, 156, 25 L.Ed. 244 (1878). *See Phillips v. Smith*, 485 F.Supp. 1365, 1370 (S.D.N.Y.), *aff'd*, 632 F.2d 1019 (2d Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 1345, 67 L.Ed.2d 332 (1981). The question of whether one's right of confrontation has been abridged would seemingly also involve a mixed question of law and fact.

Having resolved this inquiry, the next issue is a narrow one: whether the petitioner defers to state court findings of basic facts, and, if not, whether the petitioner relies lawfully upon a categorical exception to the presumption of correctness. Here, the trial court found no purely basic facts, and the New York Court of Appeals found only a few basic facts, which are essentially uncontroverted by the petitioner and the respondents. Hence, no genuine disagreement exists with respect to the reliability of the state court findings of basic fact.

█ It thus would appear that the only remaining determinations to be made involve matters that are properly the objects of federal collateral attack: (1) whether, given the basic facts as found by the state courts and reflected in the record, and as discussed at the outset of this opinion, the State's failure to accord the petitioner a new trial was error, inasmuch as it allegedly deprived Sher of a fair trial and of an opportunity to confront the evidence against him; and (2) if it were constitutional error, "whether there was any reasonable likelihood that it affected the fairness of the [petitioner's] trial," *Taylor v. Lombard*, 606 F.2d 371, 375 (2d Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980), *questioned on other grounds, Sumner v. Mata, supra*, or whether the error "was harmless beyond a reasonable doubt,"

*Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967), *quoted in Harrington v. California*, 395 U.S. 250, 251, 89 S.Ct. 1726, 1727, 23 L.Ed.2d 284 (1969).

## IV.

### A.

The bedrock, and pride, of this country's scheme of criminal justice is the time-honored principle that no person shall be found guilty and punished on the basis of incompetent, extrajudicial, and, indeed, extra-legal, matters. As Mr. Justice Holmes astutely observed:

> The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print.

*Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879 (1907). Successive Courts have undeviatingly reaffirmed this rule of American justice, that a person may be deprived of liberty, or life, only by a verdict based upon evidence presented as proof in an open court. *See, e. g., Taylor v. Kentucky*, 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978); *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *Sheppard v. Maxwell*, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966).

█ Several specific guarantees that have been enshrined in our Constitution serve to safeguard such a cherished value. First, the right to a trial by jury, secured to all accused criminals charged with serious crimes, requires that defendants be tried by a panel of fair, impartial, and indifferent jurors. *See, e. g., Irvin v. Dowd*, 366 U.S. at 722, 81 S.Ct. at 1642. Second, the right of confrontation, "[o]ne of the fundamental guarantees of life and liberty," *Kirby v. United States*, 174 U.S. 47, 55, 19 S.Ct. 574, 577, 43 L.Ed. 890 (1899), *quoted in Pointer v. Texas*, 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965), mandates that a defendant be provided an adequate and

meaningful opportunity to confront all witnesses and evidence against him, and that the jury be afforded an equally vital opportunity to assess the credibility of witnesses. *See, e. g., Berger v. California*, 393 U.S. 314, 315, 89 S.Ct. 540, 541, 21 L.Ed.2d 508 (1969); *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968), *overruling, Delli Paoli v. United States*, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957); *Parker v. Gladden*, 385 U.S. 363, 364, 87 S.Ct. 468, 470, 17 L.Ed.2d 420 (1966). Finally, the more general, overriding considerations of Due Process impose upon a court the duty to "be alert to factors that may undermine the fairness of the fact-finding process." *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 1692, 48 L.Ed.2d 126 (1976). *See Estes v. Texas*, 381 U.S. 532, 540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543 (1965). "A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the *probability* of unfairness." *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955).

█ Aside from constitutional constraints, the supervisory powers that all trial judges must carefully exercise also exist to ensure that the integrity of our courts will not be tarnished by a diminution of popular faith in the justness of judge and jury decisions. "[No] ground of suspicion that the administration of justice has been interfered with [can] be tolerated." *Mattox v. United States*, 146 U.S. 140, 149, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892). *See Estelle v. Williams*, 425 U.S. at 503, 96 S.Ct. at 1692. In this same vein, the Sixth Circuit has eloquently stated:

> Inherent in our scheme of justice is the assumption that litigants will have faith in the probity of jury verdicts. Absent such faith the stability on which we depend for the orderly functioning of our legal institutions would be in doubt....

*United States v. Ferguson*, 486 F.2d 968, 971 (6th Cir. 1973).

Among all other possibly erosive forces at work, perhaps the likelihood of juror prejudice most threatens to dilute the principle that the accuseds shall be found guilty only upon the basis of probative evidence adduced at trial. Indeed, each safeguard that exists to secure this principle probably owes its *raison d'etre* to the enduring nature of such a threat.

█ Thus, to effectuate these protections, courts have adhered to the longstanding rule of law that in a criminal action,

> *any* private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed *presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties.

*Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (emphasis supplied). *See United States v. Myers*, 626 F.2d 365, 366 (4th Cir. 1980); *United States v. Forrest*, 620 F.2d 446, 457 (5th Cir. 1980); *Sullivan v. Fogg*, 613 F.2d 465, 467 (2d Cir. 1980); *United States v. Fleming*, 594 F.2d 598, 608 (7th Cir.), *cert. denied*, 442 U.S. 931, 99 S.Ct. 2863, 61 L.Ed.2d 299 (1979); *United States v. Moten*, 582 F.2d 654, 659 (2d Cir. 1978); *Government of the Virgin Islands v. Gereau*, 523 F.2d 140, 150–51 (3d Cir. 1975), *cert. denied*, 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976); *United States v. Brasco*, 516 F.2d 816, 819 (2d Cir.) (per curiam), *cert. denied*, 423 U.S. 860, 96 S.Ct. 116, 46 L.Ed.2d 88 (1975); *United States v. Ferguson*, 486 F.2d at 971; *Ellis v. Oklahoma*, 430 F.2d 1352, 1355–56 (10th Cir. 1970), *cert. denied*, 401 U.S. 1010, 91 S.Ct. 1260, 28 L.Ed.2d 546 (1971). *See also Bulger v. McClay*, 575 F.2d 407, 412 (2d Cir.), *cert. denied sub nom. Ward v. Bulger*, 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978). Although the presumption is rebuttable, the government bears a very heavy burden to demonstrate that any such contact or conversation was

"harmless to the defendant." *Remmer v. United States*, 347 U.S. at 229, 74 S.Ct. at 451. *See Mattox v. United States*, 146 U.S. at 150, 13 S.Ct. at 53; *United States v. Myers*, 626 F.2d at 366; *United States v. Forrest*, 620 F.2d at 357; *United States v. Ferguson*, 486 F.2d at 971; *Ellis v. Oklahoma*, 430 F.2d at 1355–56. If the government fails to make this showing, the jury verdict is invalidated. *See Mattox v. United States*, 146 U.S. at 150, 13 S.Ct. at 53.

■ Difficulties of course lie in the assessment of juror partiality, not the least of which is the problem that "[i]mpartiality . . . . is a state of mind." *United States v. Wood*, 299 U.S. 123, 145–46, 57 S.Ct. 177, 185, 81 L.Ed. 78 (1936). *See Irvin v. Dowd*, 366 U.S. at 724, 81 S.Ct. at 1643. "The actual impact of a particular practice on the judgment of jurors cannot always be fully determined. But this Court has left no doubt that the probability of deleterious effects on fundamental rights calls for close judicial scrutiny." *Estelle v. Williams*, 425 U.S. at 504, 96 S.Ct. at 1693. In this regard, although a federal court that reviews a habeas corpus petition must accord deference to the state trial judge's evaluation of the likelihood of juror bias, *see, e. g. Arizona v. Washington*, 434 U.S. 497, 513, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978); *United States v. Moten*, 582 F.2d at 660; *Dunkerley v. Hogan*, 579 F.2d 141, 146 (2d Cir. 1978), *cert. denied*, 439 U.S. 1090, 99 S.Ct. 872, 59 L.Ed.2d 56 (1979); *United States v. Hockridge*, 573 F.2d 752, 756 (2d Cir.) *cert. denied*, 439 U.S. 821, 99 S.Ct. 85, 58 L.Ed.2d 112 (1978), the court must independently satisfy itself that state tribunals have scrupulously honored fundamental federal rights.

One general rule has traditionally governed this branch of the criminal law: instructions by the presiding judge to the effect that jurors should ignore improperly acquired information will cure the taint of possibly prejudicial material. *See Waldron v. Waldron*, 156 U.S. 361, 383, 15 S.Ct. 383, 389, 39 L.Ed. 453 (1895). The genesis of this rule appears to be rooted in the presumption, of sorts, that jurors will adhere to their oaths, and will be true to the in-

structions of the trial judge. This quasi-presumption, in turn, rests soundly upon the compelling need to preserve the sanctity and solemnity of the fact-finding process.

Like all general rules, however, the notion of curative jury instructions is subject to various conditions. Paramount among these considerations is whether the information has so strongly made an impression upon jurors that any subsequent attempt at retraction by the trial judge would be an inherently hollow gesture. *See, e. g., Throckmorton v. Holt*, 180 U.S. 552, 567, 21 S.Ct. 474, 480, 45 L.Ed. 663 (1901); *Hopt v. Utah*, 120 U.S. 430, 438, 7 S.Ct. 614, 618, 30 L.Ed. 708 (1887). As Mr. Justice Frankfurter said:

> The fact of the matter is that too often such admonition against misuse is intrinsically ineffective in that the effect of such a nonadmissible declaration cannot be wiped from the brains of the jurors. The admonition therefore becomes a futile collection of words and fails of its purpose as a legal protection to defendants against whom such a declaration should not tell.
>
> \* \* \* \* \* \*
>
> The Government should not have the windfall of having the jury be influenced by evidence against a defendant, which, as a matter of law, they should not consider but which they cannot put out of their minds.

*Delli Paoli v. United States*, 352 U.S. at 247, 248, 77 S.Ct. at 302, 303 (Frankfurter, J., dissenting), *quoted in Bruton v. United States*, 391 U.S. at 129, 88 S.Ct. at 1624. Mr. Justice Jackson was less charitable in his observation concerning the abilities of jurors: "The naive assumption that prejudicial effects can be overcome by instructions to the jury . . . all practicing lawyers know to be unmitigated fiction . . . ." *Krulewitch v. United States*, 336 U.S. 440, 443, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949) (Jackson, J., concurring), *quoted in Bruton v. United States*, 391 U.S. at 129, 88 S.Ct. at 1624. Given this factor, an analogy to the context of improperly received evidence provides a useful standard:

[T]he curative effect of the correction depends upon whether or not, considering the whole case and its particular circumstances, the error committed appears to have been of so serious a nature that it must have affected the minds of the jury despite the correction by the court.

*Waldron v. Waldron*, 156 U.S. at 383, 15 S.Ct. at 389.

A more subtle way in which the general rule may be undermined has to do with the psychological effect upon a juror of having him or her appear before a judge, or peers, and profess impartiality. In this regard, the Supreme Court has made this observation: "No doubt each juror was sincere when he said that he would be fair and impartial to the petitioner, but the psychological impact requiring such a declaration before one's fellows is often its father." *Irvin v. Dowd*, 366 U.S. at 728, 81 S.Ct. at 1645. *See Phillips v. Smith*, 632 F.2d at 1022. The Second Circuit has also given recognition to this phenomenon: "Obviously, if the members of the jury are questioned in depth about a possible jury tampering incident, they may become so prejudiced that the accused cannot obtain a fair trial." *United States v. Moten*, 582 F.2d at 661. The problem, which is double-edged, is the dilemma that a cure may be worse than the disease. On the one hand, extensive inquiries and admonitions may serve only to reinforce all the more the strength of a particular thought, thus nurturing a possibly latent prejudice against an accused. On the other hand, these same judicial comments may also drive a juror to lean over backwards, so to speak, not to show partiality one way or the other, thus calling into question the effectiveness of the standard of guilt beyond a reasonable doubt and of the presumption of innocence. *See generally Taylor v. Kentucky, supra; Estelle v. Williams, supra*. In view of these incalculable considerations, a trial judge's inquiry into possible juror bias may not necessarily suffice as a prophylactic measure.

 For all of these reasons, a second general rule in this area is that a juror's statements that he or she can remain impartial, and that he or she was uninfluenced by the improperly acquired information, are not dispositive of the issue of juror partiality. *See, e. g., Sheppard v. Maxwell*, 384 U.S. at 351, 86 S.Ct. at 1516; *Irvin v. Dowd*, 366 U.S. at 728, 81 S.Ct. at 1645; *Sullivan v. Fogg*, 613 F.2d at 467. A trial judge, then, must base an evaluation of juror prejudice upon a consideration of the totality of the circumstances. Also relevant, of course, is an objective measure in regards to whether a reasonable, ordinary, and prudent juror would be irrevocably affected by the information.

### B.

Applying these principles to the case at bar, the conclusion is inescapable that the trial judge deprived Sher of fundamental federal rights when he did not declare a mistrial upon discovery of the jury tampering incident.

 Aside from the presumptive prejudice that attached to the jury tampering incidents, the extraordinarily prejudicial impression left by the anonymous caller upon the jurors is lamentably plain. The caller's statements regarding, *inter alia*, Sher's defense of insanity and his vicious character were so strong and influential that the jurors, who manifestly could not forget the communications, ignored the repeated instructions of the judge not to discuss the case among themselves. To the jurors, the judge's instructions may have seemed to hamper and obstruct their responsibilities as jurors, or may have otherwise been simply overshadowed by the telephone intrigues. Whatever the reason, because of this flagrant disregard by the jurors of their solemn oaths and of judicial instructions, it is difficult to place faith in the jurors' subsequent, unsworn declarations that they could remain true to an oath of impartiality and fairness. In short, the curative measures taken by the trial judge seem to have been intrinsically ineffectual.

The State, however, insists that it has met its burden of refuting the presumption of prejudice. Three arguments are made in this regard.

Firstly, the State argues generally that Mr. Nachbar was the only juror to whom prejudicial information was imparted. This argument must fall. All jurors who received and discussed the calls were presumptively prejudiced, and, as evidenced by their actions noted above, were in fact influenced by the nature of the contacts. The withdrawal of Mr. Nachbar from the jury, then, would not have removed the taint. Moreover, it is interesting to note Mr. Nachbar's observation that the caller appeared to be reading from a prepared text. If this observation were accurate, it is reasonable to believe that other jurors received the same information as Nachbar, but, for some reason, did not reveal the entire substance of the conversations to the judge.

Secondly, the State asserts that no prejudice existed when Mr. Nachbar learned that Sher had a past record because the evidence adduced in support of Sher's defense of insanity reflected Sher's prior illegal activities. The Court does not share this view. Because the caller did not elaborate the past record of Sher, Mr. Nachbar could reasonably have believed that Sher did not make known in open court all of his past criminal actions.

Thirdly, the State maintains that no prejudice arose when Mr. Nachbar learned that Sher's co-defendant had earlier been sentenced to death, inasmuch as Mr. McDougald, who became foreman of the jury, stated in pretrial voir dire that he was aware of the "disposition" of the co-defendant's case. In this regard, Mr. McDougald stated further during his voir dire as an alternate juror that such knowledge would not affect his ability to afford Sher a fair trial. This position of the State is also meritless. The source, timing, and manner of the acquisition of knowledge is of crucial importance. Before one even appears as a prospective juror, one may learn a piece of factually neutral information from a newspaper or a friend. Once selected as a juror, however, and saddled with the responsibility of serving as the conscience of the community and of declaring the guilt or innocence of an accused menace to society, one then becomes burdened with a heightened moral sensitivity that probably would not otherwise have been present before one's involvement on a jury in a criminal case. Hence, although a type of information may be non-prejudicial when acquired by one person before trial, this material may indeed be prejudicial when another person acquires it during trial and under the circumstances present here.

Having concluded that the trial judge committed error, the remaining question is whether the error affected the fairness of Sher's trial, or whether it was harmless beyond a reasonable doubt.

Here again, the answer is clear. It is true that Sher never denied the fact that he shot Mr. Hansen. However, by asserting a defense of insanity, Sher attempted to persuade the jury that he lacked the requisite intent to commit the charged act. On this score, after an examination of the trial record, the Court finds that Sher introduced persuasive evidence of his insanity. Upon such a record, no court can justly conclude that the evidence against Sher was so overwhelming that the error committed by the trial judge was inconsequential. *Cf.: Harrington v. California*, 395 U.S. at 254, 89 S.Ct. at 1728.

### V.

Even if the actions of the trial judge would not constitute reversible error in a non-capital case, the threat of the death penalty in Sher's trial casts the matter in a different light.

> [I]n many ... cases the jury can and will follow the trial judge's instructions and disregard such information. Nevertheless, ... there are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury cannot be ignored.

*Bruton v. United States*, 391 U.S. at 135, 88 S.Ct. at 1627. A capital trial is one such "contex[t]." "It is vital in capital cases

that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Mattox v. United States*, 146 U.S. at 149, 13 S.Ct. at 53.

Since Sher's trial, and since the filing of Sher's first application for a writ of habeas corpus, the Supreme Court has radically altered the complexion of capital punishment litigation. *Cf.: Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). In 1976, the Court shifted its focus from a substantive analysis of capital punishment to a procedural one. Noting that the death penalty is "qualitative[ly] differen[t]" from other punishments, *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), and is "unique in its severity and irrevocability," *Gregg v. Georgia*, 428 U.S. 153, 187, 96 S.Ct. 2909, 2931, 49 L.Ed.2d 859 (1976), the Court embarked upon a course of ascribing high standards of procedural fairness of capital trials that are not necessarily applicable in non-capital cases. *See, e. g., Bullington v. Missouri*, —— U.S. ——, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981); *Beck v. Alabama*, 447 U.S. 625, 637–38, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980); *Green v. Georgia*, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979); *Id.* at 98–99, 99 S.Ct. at 2152 (Rehnquist, J., dissenting); *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978); *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *Id.* at 371, 97 S.Ct. at 1211 (Rehnquist, J., dissenting). *See generally* Note, *A Sliding Scale Approach to Due Process in Capital Punishment Litigation*, 30 Syracuse Law Review 675 (1979). In this regard, courts must regard as a "material fact" in their legal analyses whether a possible penalty is death. *Corbitt v. New Jersey*, 439 U.S. 212, 217, 99 S.Ct. 492, 496, 58 L.Ed.2d 466 (1978).

Given this decided change in the law, it is inconceivable how, today, Sher's conviction and death sentence could withstand judicial scrutiny. The possibility that the telephone calls and subsequent discussions among jurors remained a continuing influence throughout the trial, created too substantial and impermissible a risk that the jury found Sher guilty for reasons not derived from evidence presented in Court. Moreover, in view of the fact that the jury deliberated at length about the type of sentence to impose upon Sher, and indeed reported to the trial judge that they were deadlocked, the Court cannot conclude that the improper communications were not a factor that tipped torn jurors in favor of the death sentence.

## VI.

It is often stated that the law requires only a fair trial, not a perfect one. *See, e. g., Michigan v. Tucker*, 417 U.S. 433, 446, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974); *Bruton v. United States*, 391 U.S. at 135, 88 S.Ct. at 1627; *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1963). In the judgment of this Court, the jury tampering and jury discussions about the calls " 'created a condition from which prejudice . . . ar[o]se.' " *United States v. Ferguson*, 486 F.2d at 971 (citation omitted). These incidents infected the petitioner's entire case, making it unfair under the ordinary requirements of criminal trials, and unconscionable under the high standards imposed upon capital trials.

Accordingly, as this Court has earlier ruled, the petitioner's application for a writ of habeas corpus is granted. The State must therefore release the petitioner unless it retries him for the charged offenses within sixty days of the date of this Memorandum-Decision and Order.

IT IS SO ORDERED.