UNITED STATES of America,
Plaintiff-Appellee,

v.

George Louis GLAESER, Jr. and
Mechmetals Corporation,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Anthony Edward O'CARROLL,
Defendant-Appellant.

Nos. 75–3611, 75–3626.

United States Court of Appeals,
Ninth Circuit.

March 17, 1977.

Rehearing Denied April 20, 1977.

Morton H. Boren, appeared, Los Angeles, Cal., for defendants-appellants in No. 75–3611.

James P. Cantillon, argued, Cantillon & Cantillon, Los Angeles, Cal., for defendant-appellant in No. 75–3626.

William D. Keller, U. S. Atty., Wilfred A. Hearn, Jr., argued, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS and KENNEDY, Circuit Judges, and JAMESON,* District Judge.

CHAMBERS, Circuit Judge:

Defendants appeal from their convictions after a jury trial of conspiring to defraud the Government in violation of 18 U.S.C. § 371, and of fraud by wire in violation of 18 U.S.C. § 1343. Defendants present three arguments on appeal, the most serious of which is whether an entrapment instruction should have been given to the jury. We affirm.

Statement of Facts

Defendant Mechmetals Corporation (Mechmetals) and Mechanized Science Seals, Incorporated, (MSS) were rival corporations, each manufacturing an item known as a "pivot" to be used in the gyro-compass assembly of the United States Air Force's F–4 Phantom Jet and TFX aircraft. The two corporations submitted individual bids to produce this pivot to the Department of Defense. Defendant Glaeser was president of Mechmetals and defendant O'Carroll worked in a sales capacity for Glaeser. O'Carroll had previously worked for MSS for a short time as a sales representative before being discharged. A Mr. Hamren was president of MSS and a Mr. Heesch was secretary-treasurer. In mid-1974, Tinker Air Force Base issued a request for bids to produce the pivot. Both Mechmetals and MSS submitted bids, and Mechmetals' was lower. MSS believed that Mechmetals was not qualified to make the pivot and therefore filed a protest with the Air Force. This protest was subsequently denied.

The Government's evidence at trial revealed that defendant O'Carroll telephoned Hamren on October 21, 1974, and indicated that Mechmetals would secure the Air Force contract since it was low bidder. Hamren informed O'Carroll of the protest filed by MSS. O'Carroll then stated that he had a solution whereby for payment of $50,-000.00, Mechmetals would withdraw its low bid so that MSS would secure the contract, and that if MSS did not go along with the scheme, Mechmetals could put MSS out of the pivot business by continually underbidding it. Hamren, sensing a possible extortion plot, notified Heesch of this occurrence. Later the same day, O'Carroll returned a telephone call from Heesch, who recorded the conversation. In a lengthy conversation, O'Carroll in vague terms indicated that he could see to it that MSS received the contract and that he could arrange for MSS to be guaranteed all future contracts

* The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation.

on the pivot by influencing Mechmetals to either not bid or to bid higher than MSS.

The next day, October 22, 1974 Heesch attended the conference at Tinker Air Force Base concerning MSS' protest over Mechmetals' pivot-producing capabilities. This protest was denied, but Heesch never learned of that denial. On October 23, Heesch informed an FBI agent friend of his about the October 21 telephone conversation with O'Carroll. Heesch met with the agent on October 24, and the agent instructed Heesch to include a witness in future meetings with O'Carroll.

On October 25, 1974, defendant O'Carroll met with Heesch and Hamren of MSS. In an unrecorded conversation, O'Carroll told them that he wanted $50,000.00 as a down payment after MSS secured this contract, and that he wanted ten percent on future pivot contracts for the next five years. O'Carroll also discussed a method whereby, through exchanging information, MSS could be assured of being low bidder. On the following day, October 26, after meeting with defendant Glaeser, O'Carroll met with Heesch and Hamren again and indicated in another unrecorded conversation that Glaeser would go along with the plan and split the proceeds with O'Carroll. O'Carroll also discussed how "cover" sales representative contracts could be drawn up so as to make the payment from MSS look legal. On October 29, O'Carroll showed Heesch a wire and letter signed by defendant Glaeser and addressed to Tinker Air Force Base which would be sent to withdraw Mechmetals' bid. In a recorded conversation, O'Carroll went over the cover contracts again and reiterated that Glaeser was to receive a share of the proceeds from MSS.

On October 31, 1974, defendant Glaeser for the first time visibly entered the picture when he and O'Carroll met with Heesch, Hamren and a third principal of MSS. At this meeting, which was recorded and surveilled by the FBI, both Glaeser and O'Carroll acknowledged that they understood the deal to be for Mechmetals to withdraw its bid in exchange for $50,000.00, thereby guaranteeing the contract to MSS as the sole remaining bidder, and for ten percent of all future pivot orders to go to the defendants. In return, defendants were to see to it that MSS always won the contract and thus would be unhindered in raising its prices. At the end of this meeting, a $50,-000.00 check was given to the defendants, who then proceeded to send a wire cancelling Mechmetals' bid. Defendants were then arrested.

Testimony by defendants O'Carroll and Glaeser on their own behalf varied considerably from the Government's proof. O'Carroll contended that he was initially contacted by MSS and not vice versa, and that his subsequent contacts and discussions with MSS were merely to investigate the possibility of being reinstated as a sales representative for MSS. The main point of his initial meetings with MSS, according to O'Carroll, was to see whether MSS might want to do some subcontracting work for Mechmetals should the latter secure the pivot contract.[1] O'Carroll alleged that at the October 25 meeting, it was Heesch who suggested that Glaeser withdraw his bid and receive a subcontract from MSS for pivots at a higher price (rather than MSS doing subcontract work for Mechmetals, as O'Carroll allegedly had suggested). According to O'Carroll, the idea of having Glaeser withdraw his bid originated with Heesch and Hamren after they learned that Mechmetals would not do subcontract work under MSS. O'Carroll testified that he thought his persuading Glaeser to withdraw the Mechmetals' bid was a condition precedent to his own reinstatement as a sales representative for MSS. The $50,000.00 apparently was to be a loan to O'Carroll to be paid back from his future commissions as sales representative for MSS. O'Carroll denied any intention of sharing any money from MSS with Glaeser or of promising Glaeser anything for his withdrawal of the Mechmetals' bid.

According to both defendants, Glaeser had actually decided to withdraw the

---

1. The principals of MSS denied any such subcontract discussions.

Mechmetals' bid before October 21 because of his doubts about Mechmetals' capabilities, but O'Carroll urged him to hold off and Glaeser did so for O'Carroll's benefit (to aid O'Carroll in obtaining the sales representative position with MSS). Glaeser claimed to have played along by leading MSS to believe that O'Carroll was persuading him to withdraw the Mechmetals' bid, when in fact he had planned to do so all along. Both defendants claimed that the tape recorded conversations, which were played to the jury at trial, were taken out of context and that they had not really meant what they said.

### Entrapment Instruction

Defendants' primary allegation of error is the district court's refusal to give their requested entrapment instruction. The district court initially agreed to give the instruction for defendant O'Carroll since there was conflicting testimony as to whether MSS contacted O'Carroll first or vice versa, and as to the subject matter and course of discussion at certain meetings that admittedly took place and others that O'Carroll claimed to have occurred but which the MSS' witnesses denied.[2] The district court, however, later changed its mind and decided not to give the entrapment instruction when the Government brought our court's *Eastman* case and its progeny to the district court's attention. *Eastman v. United States*, 212 F.2d 320 (9th Cir. 1954). *Eastman* required a defendant to admit the commission of the offense charged before being able to raise the entrapment defense, and here the defendants did not expressly do so. For that reason, the district court refused to give the instruction. Subsequently, *Eastman* was overruled by *United States v. Demma*, 523 F.2d 981 (9th Cir. en banc 1975), which held that a defendant cannot be required to admit the act charged before asserting the entrapment defense.

After *Demma* came down, the defendants here moved for judgment of acquittal or for a new trial in district court primarily because of that court's refusal to give the entrapment instruction. The district court denied the defendants' motions, even though it conceded that it probably would have given the instruction after *Demma* through an "overabundance of precaution." In denying the motions, however, the court also declared that it could "find no substantial evidence, no credible evidence, that would justify any reasonable jury in finding entrapment under the circumstances," and that defendants' convictions were supported by "overwhelming evidence." In the district court's view, O'Carroll's version of the story, which arguably gave rise to a claim of entrapment, was completely belied by his own recorded statements.

■■■ Although the district court refused the defendants' requested entrapment instruction before *Demma* was decided by this court, *Demma* has been accorded retroactive application to all cases pending on appeal on the date *Demma* was decided. *United States v. Hart*, 546 F.2d 798 (9th Cir. en banc 1976). Thus, *Demma* applies to this case. If the sole reason or possible justification for the district court's refusal to give the entrapment instruction was defendants' failure to admit commission of the offenses charged, *Demma* would compel reversal here. However, *Demma* expressly left standing this court's prior decisions involving the sufficiency of the evidence to require an entrapment instruction. *United States v. Demma, supra,* at 984 n. 4. Those prior cases make clear that entrapment consists of two elements: Government agents must induce the defendant to commit the offense; and the defendant's predisposition must be such that he is not otherwise ready and willing to commit the offense on any

---

2. The entrapment instruction was considered and initially approved by the district court only with regard to defendant O'Carroll. There was no evidence of defendant Glaeser being entrapped in any way, and this court does not subscribe to any notion of derivative or secondhand entrapment. *See United States v. Jen-*

*kins,* 470 F.2d 1061 (9th Cir. 1972), *cert. denied,* 411 U.S. 920, 93 S.Ct. 1544, 36 L.Ed.2d 313 (1973). Therefore, even if the district court erred in refusing to give the instruction for defendant O'Carroll or in denying his motion for a new trial on that ground, this would have no effect on defendant Glaeser.

propitious opportunity. *United States v. Glassel,* 488 F.2d 143, 146 (9th Cir. 1973), *cert. denied,* 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). The defendant's lack of predisposition is the crux of the entrapment defense. *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976); *United States v. Reynoso-Ulloa,* 548 F.2d 1329 (9th Cir. 1977). The duty of determining whether the elements of the defense present an issue of fact for the jury is that of the judge. *United States v. Glassel, supra; United States v. Payseur,* 501 F.2d 966, 971 (9th Cir. 1974). If the evidence presents no genuine dispute as to whether the defendant was entrapped, there is no factual issue for the jury, and the judge then has a duty to rule on the defense as a matter of law. *Id.* To send the issue to the jury, there must be some evidence of inducement or persuasion by the Government. *United States v. Christopher,* 488 F.2d 849, 850–51 (9th Cir. 1973). The lone fact that the Government or its agents made the initial contact is evidence only that the Government furnished the opportunity for the commission of the crime. *Id.*

■ Applying these principles to this case, we agree with the district court's determination, albeit after-the-fact, that there was insufficient credible evidence to support defendants' claimed entitlement to the requested entrapment instruction. Defendant O'Carroll's assertion that MSS contacted him first is of no avail, since at most that would indicate only that the opportunity to commit the crime was furnished him.

Although Heesch may be viewed as a Government agent working under FBI direction after October 23, when he first contacted his FBI agent friend, O'Carroll was clearly predisposed to commit the offenses prior to that time. The recorded October 21 telephone conversation between O'Carroll and Heesch illustrates at least that much. The ambiguity and evasiveness which permeates that lengthy recording does not negate O'Carroll's predisposition, but rather simply reflects his cautiousness about proposing and entering into his criminal venture.[3] Additionally, even after Heesch made contact with the FBI, O'Carroll showed no reluctance to enter into the illegal relationship; nor was there any evidence of insistent persuasion or inducement by the principals of MSS. O'Carroll's version of the events not only fails to establish these vital elements of the entrapment defense, but also is completely contradicted by his own recorded statements. The evidence as a whole clearly indicates the lack of inducement and the predisposition of the defendants.

Under these circumstances, we endorse the district court's ultimate conclusion that no jury could reasonably doubt that defendant O'Carroll was predisposed to commit the offense charged. Although the district court's express reason for initially refusing the entrapment instruction was grounded in now obsolete law, we nevertheless are of the view that the district court, as it later determined in denying defendants' motion for a new trial, would have been justified in ruling against entrapment as a matter of

**3.** The totality of the October 21 recorded conversation reveals O'Carroll's criminal design and predisposition to commit the offenses charged. Some of the more poignant statements made by O'Carroll during the course of that conversation were:

"I think we can make a deal that you can get this contract. Can I put, put it that way?" (Tr. 343.)

"I think I could not only, uh, uh, uh, help you in, in obtaining this particular contract

. . . . .

"But, uh, but, but I can assure you that, uh, I could support you in the future, to either no bid, or always bid so that you are competitive." (Tr. 346–47.)

"I mean, I mean, now let's face it, uh, you know, you never heard me, I mean I deny I ever said that." (Tr. 347.)

"And you and I get together, let me make a buck, you guys make, uh, a little less this time but all you want the next time and see if I can't influence somebody." (Tr. 350–51.)

"But that you'd never be bothered, uh, at least by that company, regarding that, that particular pro, product, okay. And then, and then, and then whatever it cost you, which would be significant, it would come out of the price of the thing itself, not, you know, not out of your treasurer or anything like that. You know what I mean?" (Tr. 355.)

law and thus refusing the instruction for want of sufficient evidence.

### Other Contentions

 Defendant Glaeser challenges the sufficiency of the evidence to link him to any alleged conspiracy. The district court concluded that there was no evidence of Glaeser's participation in any such conspiracy until the October 31 meeting. The jury therefore was instructed to consider only the evidence about that meeting in determining whether Glaeser was involved in a conspiracy. Glaeser claims, however, that the district court's emphasis in its instructions of the prior recorded conversations between defendant O'Carroll and MSS was prejudicial to defendant Glaeser since the jury most likely considered that evidence as well in concluding that Glaeser was involved in a conspiracy. Defendant Glaeser made several damaging statements at the October 31 meeting which were recorded, and the jury could easily have found from this evidence alone that Glaeser indeed was knowingly implicated in the conspiracy. The court's instructions in this regard were more than sufficient. Enough evidence to connect Glaeser with the conspiracy was presented here. *United States v. Knight,* 416 F.2d 1181 (9th Cir. 1969).

Both defendants finally make the related claim that they were prejudiced by the district court's emphasizing the Government's tape recorded evidence and referring to the tapes as "significant" in its instructions to the jury. According to the defendants, this had the effect of down-playing the defense evidence of non-recorded conversations and alleged meetings. We find no error in this regard. The district court instructed that the tapes were to be considered in conjunction with both the Government's and the defendants' version of the story. Additionally, the jury was instructed to consider very carefully the testimony of unrecorded contacts, and the judge clearly stated that he in no way meant to suggest that the tapes represented the only crucial evidence in the case. Finally, the court announced its neutrality as to the merits of the case. Therefore, we find no abuse of the district court's discretion in offering observations on the evidence during instructions. *See United States v. Diaz-Rodriguez,* 478 F.2d 1005 (9th Cir.), *cert. denied,* 412 U.S. 964, 93 S.Ct. 3024, 37 L.Ed.2d 1013 (1973). Defendants' convictions accordingly are affirmed.