**UNITED STATES of America, Plaintiff-Appellee,**

v.

**William Henry FORREST, Defendant-Appellant.**

**No. 78–5759.**

United States Court of Appeals, Fifth Circuit.

July 2, 1981.

Marc Cooper, Miami, Fla., for defendant-appellant.

Donald S. Modesitt, Michael T. Simpson, Asst. U. S. Attys., Tallahassee, Fla., for plaintiff-appellee.

Before GODBOLD, Chief Judge, and HILL and POLITZ, Circuit Judges.

PER CURIAM:

On direct appeal of his convictions by a jury of 21 counts, including violations of 18 U.S.C. §§ 659, 2312, 2313, and 2315, we rejected all of William Henry Forrest's assignments of error, save one. We remanded for a hearing on Forrest's complaint that his trial was tainted because there was an impermissible contact with the jury. We

---

directed that a hearing essentially tailored along the lines of that held in *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978), be conducted. We held that if the district court found that no prejudicial contact occurred, the conviction of Forrest would stand affirmed. *United States v. Forrest*, 620 F.2d 446 (5th Cir. 1980).

 The district court conducted an evidentiary hearing, attended by Forrest and his counsel, at which eleven of the jurors who deliberated on Forrest's verdicts, a juror who was excused, an alternate juror who did not participate, three Deputy United States Marshals and an agent of the Federal Bureau of Investigation all testified. The trial judge concluded that no prejudicial contact occurred. We agree and affirm on the basis of the findings and conclusions expressed in the trial judge's Memorandum Decision dated February 25, 1981, attached as an Appendix. Accordingly, Forrest's convictions stand AFFIRMED.

## APPENDIX

### IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PANAMA CITY DIVISION

THE UNITED STATES OF AMERICA,

 Plaintiff,

vs. MCR 78–229

WILLIAM HENRY FORREST,

 Defendant.

_____/

### MEMORANDUM DECISION

ARNOW, District Judge.

This matter is before the court upon remand from the United States Court of Appeals for the Fifth Circuit for a "qualified *Herring* type hearing" to investigate possible improper jury contact. *United States v. Forrest*, 620 F.2d 446 (1980).

The court conducted evidentiary hearings on September 25, 1980 and December 22, 1980, at which eleven of the jurors who deliberated upon defendant's verdict, a juror who was excused, an alternate juror who did not participate in deliberations, the three Deputy United States Marshals who attended trial, and a Federal Bureau of Investigation Agent were all examined on the record, under oath. Defendant attended each hearing, with counsel. The only juror who was not examined, Shirley E. White, is currently in military service and stationed in West Germany. The court deems these examinations to be sufficient for purposes of the remand inquiry.

The defendant and the plaintiff have submitted memoranda and proposed opinions reflecting their respective positions. Accordingly, this matter is now ready for resolution.

During the defendant's trial, after all evidence had been presented, but prior to final arguments and charge to the jury, the trial court was apprised of an attempt by defendant to tamper with the jury by arranging to have a niece of one of the jurors contact this juror and to persuade this juror to vote for acquittal.

A marshal was requested to go to the jury room and ask if any of the jurors knew of a person by the name given to the court as the niece's name. When the marshal returned and informed the court that juror Lillie Bell Watson did know that name, Mrs. Watson was brought into chambers and questioned. After questioning, the court decided to excuse Mrs. Watson and replace her with an alternate.

The defendant was convicted of the crimes with which he was charged. Subsequently, defendant was indicted and convicted of jury tampering and that conviction has been affirmed. *United States v. Forrest*, 623 F.2d 1107 (5th Cir. 1980).

In remanding this case the Fifth Circuit directed this court to conduct an inquiry to determine whether defendant's attempt to tamper with the jury, and the discovery of such, in any way prejudiced defendant and precluded his right to trial by a fair and impartial jury.

As the Fifth Circuit directed, the procedure followed in this inquiry was that provided for in *United States v. Herring*, 568 F.2d 1099 (5th Cir. 1978). Because the Fifth Circuit believed it "sufficiently likely" that prejudicial material did reach the jury it was unnecessary for the court to make this threshold inquiry adopted in *Herring.*

The inquiry, thus, focused on the two later questions the Fifth Circuit directed the court to consider. Was the jury contacted impermissibly? If so, did the government satisfy its burden of proving the contact was not prejudicial?

In this regard, the court understands the "jury" to be those jurors who actually deliberated upon defendant's verdict. Because Mrs. Watson and John Byrd, the unused second juror, did not take part in the jury deliberations, they are not considered as part of the "jury." However, examination of those two persons, Mrs. Watson, in particular, is relevant because they may have transmitted prejudicial information to the deliberating jurors.

One further point must be resolved before proceeding further. In memoranda submitted, the parties come to a different conclusion as to which side bears the burden of proof on one of the two questions to be considered. There is no doubt under the Fifth Circuit's decision in *Forrest*, and other cases, the government bears the "heavy burden" of proving an off-the-record contact with the jury did not affect the jury decision. *United States v. Forrest*, 620 F.2d at 457.

However, implicit in the above statement of law and, indeed, explicit in the *Forrest* court's directions to this court, is the necessity to determine first that there was some impermissible contact with the jury.

Defendant, at various points in his memorandum, argues that the government has failed to meet its burden of establishing that the jury was not contacted. The court, however, agrees with the government that defendant has the burden of proving, in the first instance, impermissible contact with the jury.

Fifth Circuit indicated three areas of inquiry: whether Mrs. Watson discussed the merits of the case with the other jurors after being contacted by her niece and before being excused, whether Mrs. Watson told the other jurors about the tampering attempt, and whether the marshals indicated to the other jurors that there had been a tampering attempt. In addition, and in an abundance of caution, the court asked whether the jurors had learned anything about the tampering attempt from any other person or from newspapers, radio, or television, prior to rendering of their verdict.

The testimony of all except one of the jurors indicated with certainty that Mrs. Watson did not discuss the merits of the case with other jurors after she was contacted by her niece but before she was excused.

Juror Shirley Ulmer did testify Mrs. Watson told her during the week of the trial, but before Mrs. Watson was excused, that she was staying with relatives and that her niece was staying at the same residence. Mrs. Ulmer stated that Mrs. Watson told her that she had not talked with anyone about the case.

Mrs. Ulmer also recalled a statement to the effect that Mrs. Watson's niece had said the Forrests were "good people" but that Mrs. Watson was not going to let that interfere with her job as a juror. Mrs. Ulmer's clearest recollection before being questioned extensively on this point was that she had heard the statement but could not remember when, where or, presumably, from whom she heard the statement.

In reviewing Mrs. Ulmer's testimony, the court finds it is probable that Mrs. Watson did tell her during the trial week that her niece was staying at the same residence. Mrs. Ulmer volunteered the information and was relatively certain about it. Standing alone, the statement is innocuous and cannot be considered either a reference to the merits of the case or a remark prejudicial to defendant.

It is improbable, however, that Mrs. Watson ever told Mrs. Ulmer that the Forrests were "good people," or that Mrs. Ulmer heard this statement during the trial. Although in answer to leading questions Mrs. Ulmer stated it was possible that she heard the statement either before or after the jury's verdict, she, understandably, could not be certain. Mrs. Ulmer read newspaper accounts after the trial of the attempted jury tampering and it is likely these accounts were the source of her knowledge. Further, none of the other jurors remembered the statement and Mrs. Ulmer stated that if the statement was made during trial, it would have been made in the presence of all the other jurors.

Mrs. Ulmer's testimony is consistent with that of Mrs. Watson. Mrs. Watson said that it was possible she mentioned to another juror that her niece was staying with her but that she did not remember ever saying that her niece told her the Forrests were good people. Although Mrs. Watson has stated that she had not discussed her niece's contact with the other jurors, it is entirely possible that at the time Mrs. Watson told Mrs. Ulmer that her niece was visiting, Mrs. Watson did not understand her niece's presence to be anything other than a social visit, as opposed to a "contact."

Because none of the other jurors could recall any discussion of this nature, and because Mrs. Ulmer's and Mrs. Watson's testimony is consistent, the court finds that Mrs. Watson never discussed the merits of the case with other jurors.*

With the exception of the second alternate juror, there is no evidence that Mrs. Watson told the other jurors of the tampering attempt. The alternate, Mr. Byrd, testified that Mrs. Watson came back to get her purse after she was excused, was asked by a juror what had happened, and answered that she was being "kicked off" the jury because they had found out about a telephone call she had received from her niece, or words to that effect. Mr. Byrd said that Mrs. Watson did not say what the telephone call was about. He said that she did not say anything about the defendants or about the case on trial. He said that neither Mrs. Watson, nor a deputy marshal, nor any other person indicated to him that there had been an attempt to contact a juror in this case.

Assuming Mr. Byrd's recollection is correct, there is still no evidence that the jury was impermissibly contacted. Mr. Byrd did not associate the telephone call with the case and did not feel that either Mrs. Watson or the person calling her had done anything improper.

Moreover, Mr. Byrd stated that neither he nor any of the other jurors discussed this comment. None of the other jurors could remember the comment having been made. Thus, the statement, if it was made, could not have been transmitted to the actual deliberating jury members.

There are a number of reasons for believing that Mrs. Watson did not make the statement Mr. Byrd recalled. Mrs. Watson had just been instructed by the court not to talk about the matter. She was aware that it was a serious matter. She was about to be interviewed by Agent Beiner to determine whether she or her niece or anyone else had done anything wrong. It simply

---

* In its decision, Fifth Circuit said Mrs. Watson's testimony is suspect because her "natural disposition would be to claim she had complied with those instructions." It has not been this court's experience, in some 13 years as a trial judge, and many years experience as a practicing attorney with, at least to extent, trial experience, that jurors normally will tend to be untruthful when questioned respecting compliance with a court's instructions. Insofar as Mrs. Watson is concerned, she impressed this court as being completely honest in telling the truth as she remembered it.

does not make sense that she would immediately, directly, and openly violate the court's order, in front of thirteen jurors and her escort.

Mrs. Watson was kept separated from the other jurors from the time she left the jury room. First she was in chambers, then taken to the witness room by Deputy Hills, and then taken back to chambers where she was given into Agent Beiner's custody, with instructions that she be kept out of the way until every one else was back in the courtroom. She did not have the opportunity to go into the jury room while the other jurors remained.

Mr. Byrd did have several other means of learning the reason for Mrs. Watson's discharge. He was discharged himself while the other jurors deliberated and could have learned then. If he stayed for the verdict he could have heard the motion for revocation of bond immediately thereafter at which the tampering was raised. If he reads the Panama City News Herald he would have seen it the next day on the top of the front page. He lives and works in Port St. Joe, thirty-five miles from Panama City. It would be surprising if he did not learn of the tampering attempt.

For these reasons, the court finds that Mr. Byrd was mistaken in his testimony. However, even if Mrs. Watson did make the statement Mr. Byrd remembers, no prejudicial information was conveyed to the deliberating jurors.

The testimony shows that the jurors did not learn of the tampering attempt from any of the marshals. All the jurors except Shirley Ulmer, Leola Moody, and Pearly Shores stated either that the marshals did not indicate that an attempt had been made outside the courtroom to contact a juror or that no person indicated that such an attempt had been made. The jurors other than these three either remembered a marshal asking whether any juror was related to or knew a person or they did not remember what he said.

Mrs. Ulmer, Mrs. Moody and Mrs. Shores each stated that no one indicated the reason for Mrs. Watson's discharge (which was the jury tampering attempt).

Mrs. Moody confused the jury room with the courtroom. When corrected, she did not remember what the marshal said.

Mrs. Ulmer was uncertain but thought the marshal either had asked if any juror knew a named person or had asked if any juror knew a friend of the defendants or the defendants.

Mrs. Shores confused the court's voir dire examination of jurors with the marshal's inquiry. Thereafter, she confused the court's comments upon Mrs. Watson's discharge with the marshal's inquiry, stating that she believed the court had said Mrs. Watson had a relative who was a friend of or knew the Forrests. (The court made no such comment.) Upon sifting through her responses, the court finds no indication that she remembers the marshal saying anything improper.

Deputy Marshals Shepard Hardy and Stanley Hills stated that they were present at the trial but that they did not make the inquiry of the jurors. Each stated that, to his knowledge, no one indicated to the jurors that there had been an attempt to contact a juror before the jury rendered its verdict.

Deputy Marshal Bill Joyce said he was the one who went into the jury room, that he asked if any juror knew an individual by the name of Eloise Surratt, that he got a positive response, and that he returned to chambers without further comment. He said that thereafter he returned to the jury room, asked the lady who responded to come with him, and left the jury room. He said that, to his knowledge, no one indicated to the jurors that an attempt had been made to contact a juror prior to the return of the verdict.

Deputy Joyce's testimony is entirely consistent with the directions given him by the court and with the testimony of the jurors who remembered any of what he had said. Because of this consistency, and because Deputy Joyce is and was an experienced marshal, well aware of the delicacy of the inquiry he was making, the court credits his

testimony over that of Mrs. Ulmer and Mrs. Shores. The court finds that the marshals did not indicate to the other jurors there had been a tampering attempt.

The jurors uniformly indicated that they had not learned of the tampering attempt from newspaper, television, radio, or any person prior to returning a verdict.

The evidence adduced at the two hearings establishes that defendant has failed to bear his burden of showing that the jury was impermissibly contacted. To the extent that the testimony of Mrs. Ulmer and Mr. Byrd casts any doubt on this finding, the government has rebutted the presumption of prejudice.

In memorandum the government, citing *United States v. Jones*, 597 F.2d 485 (5th Cir. 1979), and other cases, contends a defendant cannot cause or attempt to cause juror misconduct, gamble on a favorable verdict by so doing and remaining silent about it, and then complain about the prejudicial influence of his efforts in a post verdict motion.

This contention, and the authority cited, were not specifically discussed in the panel decision in this case. But the decision did reject the suggestion that Forrest may not be heard here to complain of the results of his own misconduct. This court is bound by that decision and, because it is, and as it must, rejects this contention of the government. Fifth Circuit, and not this court, is the proper court to consider that contention.

Because of the foregoing, the court concludes that no prejudicial contact occurred. Upon this court's understanding of the Fifth Circuit's direction of the action to be taken in view of such conclusion, order will be entered that the convictions of William Henry Forrest should stand affirmed.

DATED this 25 day of February, 1981.

### ORDER

In view of the findings and conclusions set forth in memorandum decision of this date, and on this court's understanding of the requirements upon it of the United States Court of Appeals for the Fifth Circuit's decision in this case,

It is ORDERED that the convictions of William Henry Forrest in this case should stand affirmed.

DONE AND ORDERED this 25 day of February, 1981.