UNITED STATES of America,
Plaintiff-Appellee,

v.

Karen SHAPIRO, Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Rebecca HOWARD, Defendant-Appellant.

Nos. 80–1187, 80–1188.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 7, 1981.

Decided March 1, 1982.

Russell J. Frackman, Los Angeles, Cal., for Shapiro.

Morris L. Davidson, Los Angeles, Cal., for Howard.

Kathleen P. March, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before SKOPIL, NELSON, and NORRIS, Circuit Judges.

NORRIS, Circuit Judge:

Shapiro and Howard appeal from their conviction, after trial by jury, of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 846 (1976), and possession of cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (1976). Because we find that the appellants' motion for mistrial should have been granted by the district court, we reverse.

## I.

### Facts

On the evening of November 13, 1979, three local law enforcement officers, working undercover in a joint investigation with agents of the Drug Enforcement Administration, drove to the apartment of Roy and Karen Shapiro.[1] At an earlier meeting at which appellants Karen Shapiro and Howard were not present, Roy Shapiro had agreed to deliver a quantity of cocaine to Officer DeAmicis at Shapiro's apartment. DeAmicis entered the apartment and was introduced to Karen Shapiro, Roy's wife. When Roy Shapiro asked if DeAmicis had the money, the officer told him that it was in the car outside. Roy Shapiro directed DeAmicis to return to the car and tell Officer Brown to bring the money inside. DeAmicis returned to the Cadillac and stood outside it. Appellant Karen Shapiro then approached the car and asked the men inside it, Officers Brown and Maggiora, "What's the problem? Why don't you just come on in and we can do the deal?" Maggiora showed Shapiro a briefcase full of stacks of bills, and Brown then told her that he would come inside with it when DeAmicis reported to him that the cocaine was good.

When DeAmicis and Shapiro returned to the apartment and she informed her husband that she had seen the money, Roy Shapiro announced that he would make a telephone call to have the cocaine brought over, and that the deal would be made in

Shapiro's limousine. DeAmicis and Roy Shapiro entered the limousine and Shapiro drove it from the garage to a position behind the officers' Cadillac. Karen Shapiro came outside and reported that "she's on her way." Soon thereafter, appellant Howard approached on foot. After conversing with Roy Shapiro, Howard left and returned accompanied by co-defendant Martin, who was carrying a package. Martin opened the package and let Officer Maggiora inspect the cocaine within it. The officers then placed Martin, Howard, and both Shapiros under arrest.

## II.

### Sufficiency of the Evidence to Convict Karen Shapiro

Shapiro claims that the evidence is insufficient to support her conviction for either conspiracy or possession. In considering this claim, we are limited to a determination of whether there is substantial evidence of guilt beyond a reasonable doubt. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Garner*, 663 F.2d 834, 837–38 (9th Cir. 1981). We must view the evidence in the light most favorable to the government. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Traylor*, 656 F.2d 1326, 1336 (9th Cir. 1981).

Shapiro contends that she was merely present at the November 13th transaction and had no involvement in it other than following her husband's instructions, on the belief that she would otherwise be in grave danger. She argues, correctly, that mere knowledge that a crime is being committed, even coupled with presence at the scene, ordinarily is not sufficient evidence upon which to base a conviction of participation in the crime. *See Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949); *United States v. Weaver*, 594 F.2d 1272, 1275 (9th Cir. 1979). On the other hand, only a slight

---

1. Co-defendant Roy Shapiro was convicted and sentenced. He appealed his conviction but later moved to dismiss his appeal.

connection to a previously proved conspiracy need be shown in order to convict a defendant of knowing participation in it. *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981); *United States v. Dunn*, 564 F.2d 348, 357 (9th Cir. 1977).

■ The evidence before the jury indicated the following: Shapiro went outside to the officers' car and urged them to go inside her apartment and make the deal; she inspected the money and reported to her husband; she reported that the cocaine was on the way over; and she reassured DeAmicis, upon Howard's arrival, that "it's okay; she's a friend."

To find this evidence legally insufficient to sustain Shapiro's conviction, we would have to conclude that no rational trier of fact could have concluded on this evidence that Shapiro was connected to the conspiracy beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Melchor-Lopez*, 627 F.2d 886, 890 (9th Cir. 1980). We are persuaded, to the contrary, that the evidence amply supports the jury's verdict.[2] Shapiro's claim that she was an *unwilling* participant in the conspiracy goes not to the sufficiency of the evidence but to her proffered duress defense.

### III.

#### Duress

■ Shapiro contends that it was error for the trial court to grant the prosecution's *in limine* motion to preclude her proffered duress defense. If the evidence as described in Shapiro's offer of proof was insufficient as a matter of law to support a duress defense the trial court was correct in ex-

cluding that evidence, *see United States v. Glaeser*, 550 F.2d 483, 487 (9th Cir. 1977), and in refusing to instruct the jury on duress. *See United States v. Patrick*, 542 F.2d 381, 386 (7th Cir. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775 (1977).

■ To establish a defense of duress, defendant must show that (1) she was under an immediate threat of death or serious bodily injury, (2) she had a well grounded fear that the threat would be carried out, and (3) she had no reasonable opportunity to escape. *United States v. Gordon*, 526 F.2d 406, 407 (9th Cir. 1975).

Shapiro's counsel offered to prove that Shapiro's husband

> told his wife that her life was in danger, that because her life was in danger she had better follow his directions in going down to this undercover vehicle, that basically he threatened her, and that because of that threat she undertook the action which subsequently followed ... down in the undercover vehicle in front of the apartment on Elm Street.

Counsel subsequently expanded his offer of proof, stating that Shapiro was afraid of DeAmicis because of his appearance, that she was "instructed" by her husband that "their" lives were in danger, and that "there was no opportunity to escape because of the lateness of the hour and the fact that those people were outside and downstairs and she didn't know quite what to do."

■ We agree with the trial court that Shapiro's offer of proof was insufficient as a matter of law. First, Shapiro offered no evidence of the immediacy of the threatened harm.[3] Additionally, she offered no

---

**2.** Having concluded that the evidence supports Shapiro's conspiracy conviction, we need not evaluate independently the evidence of Shapiro's participation in the substantive crime of possession with intent to distribute. *See United States v. Basey*, 613 F.2d 198, 202 (9th Cir. 1979), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 274 (1980) (a conspirator is liable for acts of her co-conspirators in furtherance of the conspiracy.)

**3.** Despite instruction from the trial judge on what the law required, and repeated opportunities to amend the offer of proof, Shapiro's counsel never stated that anyone threatened Shapiro with immediate bodily harm. Moreover, counsel's repeated assertions that Shapiro's husband "instructed" her that "their" lives were in danger indicated that the alleged threat to Shapiro's life came from third persons. Evidence in the record when counsel made the

credible evidence that she had no opportunity to escape.[4] Considering the evidence of record at the time Shapiro made her offer of proof, as well as the offer itself, we agree with the trial judge that no reasonable jury could have concluded that Shapiro acted under an immediate threat of serious bodily injury, with no opportunity to escape.

## IV.

### Predisposition

Shapiro and Howard contend that the trial court erred in permitting the government to introduce evidence of Howard's predisposition to commit the crimes alleged. It is unclear that the Howard predisposition evidence affects Shapiro. Shapiro's theory throughout the trial was that she had no connection with the drug sales. Indeed, the whole object of Shapiro's counsel's cross-examination of government witness Aroff—the alleged entrapper of Howard and the source of the predisposition evidence against Howard—was to establish that Aroff had no knowledge that Karen Shapiro was involved in the drug transaction. Aroff admitted this when questioned by Shapiro's attorney. On appeal, Shapiro offers no theory as to how she was injured by evidence of Howard's predisposition.

■ Regardless, we hold that it was not error to admit the predisposition evidence. Predisposition becomes a relevant issue in a criminal prosecution when a defendant raises the issue of entrapment. The defense of entrapment has two elements: first, government agents must have induced the defendant to commit the offense; and second, the defendant must not have been otherwise predisposed to commit the offense, given an opportunity. *United*

*States v. Glassel*, 488 F.2d 143, 146 (9th Cir. 1973), *cert. denied*, 416 U.S. 941, 94 S.Ct. 1945, 40 L.Ed.2d 292 (1974). The defendant's lack of such predisposition is the crux of the entrapment defense. *Hampton v. United States*, 425 U.S. 484, 488–89, 96 S.Ct. 1646, 1649–50, 48 L.Ed.2d 113 (1976); *United States v. Brandon*, 633 F.2d 773, 778 (9th Cir. 1980).

Howard argues, however, that the government did not offer the predisposition evidence until after the court had foreclosed an entrapment defense by ruling that the alleged entrapper, Aroff, was not a government agent. The court simply did not so rule. Howard's attorney did request, at one point, that the trial court rule on whether agency had been adequately shown to raise an entrapment issue for the jury. The court declined to rule at that stage, however, expressly advising Howard that she was free to pursue the subject of government agency and the entrapment defense in general. Accordingly, it was not error to permit the government to cross-examine Aroff as to Howard's predisposition to sell cocaine.

## V.

### Entrapment Instruction

■ Shapiro and Howard contend that their convictions must be reversed because of the trial court's refusal to instruct the jury on entrapment. We consider the claim only with respect to Howard, for Shapiro presented no evidence whatsoever that she was entrapped and, in fact, elicited Aroff's admission that he did not even know whether she was involved in the drug transaction. Shapiro has no standing to litigate whether Howard was entrapped, as this court does not recognize a concept of derivative en-

---

offer of proof, however, showed that the Shapiros were alone in their apartment immediately prior to the cocaine transaction. Thus, no one was present to enforce the threat.

4. At the time that counsel made the offer of proof, the record showed that the Shapiros lived in a multi-unit apartment building, that they had a working telephone, that the undercover agents were waiting in a car outside and

across the street, and that Karen Shapiro went outside, alone, to join the waiting undercover agents. She had, then, several avenues of escape: she could have locked the door to the apartment and called the police, gone to a neighboring apartment for help, or simply left the building without crossing the street to join the waiting undercover agents.

trapment. *See Glaeser*, 550 F.2d at 486 n.2; *United States v. Castanon*, 453 F.2d 932, 934 n.1 (9th Cir.), *cert. denied*, 406 U.S. 922, 92 S.Ct. 1788, 32 L.Ed.2d 122 (1972); *Carbajal-Portillo v. United States*, 396 F.2d 944, 947–48 (9th Cir. 1968).

 Howard argues that there was sufficient evidence of government agency and inducement to render entrapment an issue for the jury. It is the settled law of this circuit that "[t]he duty of determining whether the elements of the defense present an issue of fact for the jury is that of the judge." *Glaeser*, 550 F.2d at 487. *See United States v. Diggs*, 649 F.2d 731, 738 (9th Cir. 1981). "If the evidence presents no genuine dispute as to whether the defendant was entrapped, there is no factual issue for the jury," and the judge must rule against the defense as a matter of law. *Glaeser*, 550 F.2d at 487.

To be entitled to an instruction on entrapment, Howard must have offered some evidence of inducement or persuasion by someone who was a government agent, and some evidence contradicting the government's showing of predisposition. Howard was able to do neither, and no jury could, under the circumstances, reasonably doubt that Howard was predisposed to commit the offense charged. The trial court, therefore, was correct in ruling against entrapment as a matter of law and refusing an entrapment instruction for want of sufficient evidence.

## VI.

### *Massiah Violation*

Shapiro and Howard claim that their convictions must be reversed because of the trial court's erroneous refusal to permit their counsel to question government witness Aroff, in camera, to determine wheth-er certain post-arrest conversations violated the rule in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), that the government may not use in evidence information elicited by a government agent from a defendant, after arrest, unless the defendant had his counsel present when the information was obtained.

 Shapiro cannot complain of *Massiah* violations. None of the conversations in question involved Shapiro, and Howard's right to counsel, as protected by *Massiah*, may not be asserted by a third person. *United States v. Partin*, 601 F.2d 1000, 1006 (9th Cir. 1979), *cert. denied*, 446 U.S. 964, 100 S.Ct. 2939, 64 L.Ed.2d 822 (1980). *See Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

 We must also reject Howard's claim of a *Massiah* violation because she has failed to show that any information obtained was offered in evidence at trial. Post-arrest actions that interfere with the right to counsel do not *per se* violate the Sixth Amendment. *Weatherford v. Bursey*, 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977). Only where the actions produce, directly or indirectly, evidence offered against defendant at trial has there been a deprivation of the right to counsel. *Id.* at 552, 97 S.Ct. at 842; *United States v. Irwin*, 612 F.2d 1182, 1185–87 (9th Cir. 1980). *See United States v. Bagley*, 641 F.2d 1235, 1238–39 (9th Cir. 1981). In his uncontradicted declaration, Aroff stated that he never related to the government any information from his post-arrest conversations with Howard, and the record shows that the government never sought to introduce at trial evidence obtained in the conversations.[5] Howard has therefore shown no prejudice from the allegedly improper conversations or from the trial court's refusal to permit inquiry into those conversations.[6]

---

**5.** Howard contends that Aroff testified with respect to several post-arrest conversations with Howard. The only testimony she points to, however, is Aroff's simple "Yes" response to *defense* counsel's question whether Aroff had had any post-arrest conversations with Howard.

**6.** The trial court ruled that Howard could not elicit the substance of the conversations until she established agency, reasoning that a defendant's *Massiah* rights are implicated only when a government agent has elicited the information. Because we find no prejudice in any event, we have no occasion to address this issue.

## VII.

### *Motion for Mistrial*

The most unusual and troublesome aspect of the case relates to events involving illegal conduct by a juror. Midway through the trial, appellant Shapiro, her co-defendant husband (Roy Shapiro) and his mother received telephone calls from at least two different persons offering to arrange "help" for them. Specifically, the callers guaranteed that an acquittal could be arranged in return for a sizable cash payment. Roy Shapiro's counsel brought the calls to the trial court's attention and moved for a mistrial. At argument on the motion, all parties agreed that pre-verdict voir dire of the jurors would be counterproductive. The trial court denied the motion for mistrial. Soon thereafter, another telephone call was received, and the extortionist described how the money was to be delivered. DEA undercover agents, posing as messenger service employees, delivered the money as described and arrested juror number seven, Mr. Leoni, as the extortionist. At the time of his arrest, Leoni had in his pocket a list of each juror's name and city of residence. Leoni, of course, was immediately removed from the jury and replaced by the first alternate.

Appellants Shapiro and Howard joined in Roy Shapiro's renewed motion for mistrial. The trial court, despite the parties' earlier agreement that pre-verdict voir dire of jurors regarding tampering would be improvident, decided to question separately each remaining juror to determine whether Leoni had affected them. It is that questioning upon which we must focus.

Each juror was informed, without further explanation, that juror Leoni would be unable to continue as a juror. The judge then asked each juror (1) whether he or any family member had been contacted by anyone about the case; (2) whether any fellow juror had sought to discuss the case with him; (3) whether he had discussed the case with fellow jurors; (4) whether anything had occurred which led the juror to believe that he could not be fair and impartial; (5) whether he had overheard any fellow juror discussing specific testimony on the guilt or innocence of any defendant; (6) whether he thought that the court's questioning was occasioned by out-of-court misconduct by any of the parties; and (7) whether anything had occurred during the trial that might deprive any party of a fair or impartial verdict.

The jurors' responses to these questions must be evaluated in the context of the heavy burden that falls upon the government when jury tampering in any form occurs. In *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954), the Court stated:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial.... The presumption is not conclusive, but the burden rests heavily upon the Government to establish ... that such contact with the juror was harmless to the defendant.

*See United States v. Armstrong*, 654 F.2d 1328, 1332 (9th Cir. 1981).

The government argues that *Remmer* is irrelevant to this case because here, unlike *Remmer*, the tainted juror was removed from the jury. We reject this interpretation of *Remmer* as too narrow, and agree with the view adopted by the Sixth Circuit in *United States v. Ferguson*, 486 F.2d 968 (6th Cir. 1973). In *Ferguson*, the district court had "indicated that it did not believe that there should be a presumption of prejudice in this case because [the tainted juror] was removed from the panel and not allowed to participate in the decision." 486 F.2d at 971. The Sixth Circuit disagreed:

> Certainly a showing that the contacted juror was removed from the jury before he had the opportunity to discuss the case with other members of the panel would be some evidence that no prejudice occurred. Yet it would not so change the inquiry that there should no longer be a presumption of prejudice.

*Id.*

Two possibilities of prejudice against the defendants exist independently of Mr. Leo-

ni's presence on the jury. First, there is the possibility that before his removal, Mr. Leoni attempted to influence other jurors in favor of defendants, instead prejudicing those jurors against the defendants. This is a distinct possibility here, since Leoni promised an acquittal, not just a hung jury. To secure the promised acquittal, Leoni would have had to influence other jurors. Second, there is the possibility that Leoni's unexplained removal, coupled with the unusual questioning by the court immediately thereafter, planted in the minds of the jurors the possibility that one of the defendants had engaged in misconduct.

As the Sixth Circuit observed in similar circumstances,

> The whole jury was exposed to, and actually encountered, an outside disturbance. Each . . . was interrogated . . . about outside influences and . . . it takes no more than an ordinary observation of human nature to realize the suspicion in the minds of the jurors that something had happened extraneously in the course of the trial to influence their deliberations.

*Stone v. United States*, 113 F.2d 70, 77 (6th Cir. 1940).

We must consider, therefore, the special voir dire conducted by the trial court to determine whether it effectively rebutted the strong presumption that prejudice infected the proceedings. The record indicates that each juror stated that he had not been contacted about the case, and had not discussed with other jurors the guilt or innocence of any party. Each stated that nothing had occurred that made him think he could not be a fair and impartial juror in the case. There were, however, some indications that the jurors had made certain comments among themselves regarding the trial proceedings:

### (JUROR CHUMLEY)

THE COURT: Has any fellow juror sought to discuss or discussed the case with you?

JUROR CHUMLEY: Oh, I don't think so really. We discussed your personality on the bench, the personality of the various attorneys, the comings and goings of the Court, but occasionally it has gotten to the point where it was close to discussing the case and somebody would always mention, "Now wait a minute—we're not supposed to do this."

THE COURT: Have you ever heard any of your fellow jurors discussing the testimony of any witness or the guilt or innocence of any defendant, or the attitude of the Court towards any defendant or witness or attorney or juror?

JUROR CHUMLEY: Oh, I think so, in the sense that some of the —[Court interrupts]

### (JUROR MALONEY)

THE COURT: Has any fellow juror sought to discuss or discussed this case with you?

JUROR MALONEY: Well, let me explain the answer to that question. There have been times within the jury room where we have had just fleeting mentions of the case, but not really so much the details as maybe just the characters involved.

THE COURT: Have you sought to discuss or discussed the case with any fellow juror other than what you have just told us?

JUROR MALONEY: No, not other than just a fleeting mention of things, really.

### (JUROR HUTCHINS)

THE COURT: Has any fellow juror sought to discuss or discussed this case with you?

JUROR HUTCHINS: Not really, not in the sense of coming to a conclusion or making—just general comment, but nothing—

THE COURT: What would a normal comment be?

JUROR HUTCHINS: Oh, maybe perhaps the action of a particular counselor.

THE COURT: Have you overheard any of your fellow jurors discussing the testimony of any particular witness?

JUROR HUTCHINS: Just general comment.

THE COURT: Have you overheard any of your fellow jurors discussing the guilt or innocence of any defendant?

JUROR HUTCHINS: In a joking manner or seriousness?

THE COURT: Any way.

JUROR HUTCHINS: Nothing, not to the point of—just maybe a comment, but not to the point where—[Court interrupts]

(JUROR PATTERSON)

THE COURT: Has any fellow juror sought to discuss or discussed this case with you?

JUROR PATTERSON: No. You mean upstairs?

THE COURT: Anywhere.

JUROR PATTERSON: No, I don't think anything other than just the casual conversation, but nothing as to actually saying, you know, anything too pertinent. It has just been general conversation.

The government emphasizes that each juror assured the Court that he remained open-minded about the case and could be a fair and impartial juror. We agree that this is strong evidence against prejudice. The competing evidence, however, is that several jurors admitted to conversations about the case. With regard to the possibility that the tainted juror, Leoni, may have commented on the merits of the case in the presence of the other jurors, it is immaterial whether the comments were favorable or unfavorable to the defendants. *United States v. Forrest*, 620 F.2d 446, 457 (5th Cir. 1980).

We cannot accept the jurors' own characterization of these conversations as innocuous or joking. *See United States v. Brown*, 571 F.2d 980, 991 (6th Cir. 1978). A juror is unlikely readily to admit to a judge that he has violated the express directive of the Court against discussing the case. Indeed, even a juror's *good faith* belief in his own impartiality is not dispositive. *See Irvin v. Dowd*, 366 U.S. 717, 727–28, 81 S.Ct. 1639,

1645–46, 6 L.Ed.2d 751 (1961). Were direct contact by Mr. Leoni our only concern regarding prejudicial influence of the jury, the evidence—given the heavy presumption against the government—would present a very close case. As noted, however, there is another possible source of prejudice, the disruption of the proceedings itself. The record evidences a strong possibility that one or more of the jurors assumed that the Court's special voir dire was occasioned by defense misconduct.

"When there has been an attempt at jury tampering, the court must guard against the possibility that the jury will assume one of the parties was responsible for the attempt and, based on that assumption, decide the merits of the case unfavorably to that party." *United States v. Forrest*, 620 F.2d at 457. The questioning of the first juror provided an indication that the danger recognized in *Forrest* may have precluded a fair trial here:

THE COURT: Do you have any idea or suspicion about the reason for this questioning of you?

JUROR CHUMLEY: I really hadn't thought about it, but no, I don't. It does make a person wonder. There obviously has to be a reason.

THE COURT: Do you think this questioning has been occasioned by any out-of-court misconduct by the prosecution or any of the defendants?

JUROR CHUMLEY: Now this is what I should have been—normally would have been thinking about during lunch and everything, but we had a large lunch and we have been playing cards and I really had not thought about it.

THE COURT: I am just planting thoughts in your mind, huh?

JUROR CHUMLEY: In a sense, yes.

THE COURT: I am going to stop doing that.

The trial court thus recognized the obvious potential of the question to yield a result opposite to that which was intended; to suggest to the jurors—already befuddled by the disappearance of juror Leoni—that misconduct by a party might be the cause

of his absence or the unusual questioning by the judge. The first juror's response indicates that the trial court's question may have crossed the "difficult line between a vigorous voir dire to determine any possible bias and ... creating bias by specific questions which add 'fuel to the flames' in suggesting the presence of controversial issues." *United States v. Polizzi*, 500 F.2d 856, 880 (9th Cir. 1974), *cert. denied*, 419 U.S. 1120, 95 S.Ct. 802, 42 L.Ed.2d 820 (1975).

The trial judge, as the quoted material reflects, recognized the problem and indicated that he would not ask the remaining jurors the suggestive question about possible misconduct. Subsequently, however, he posed the identical question to each juror. Several of them responded equivocally:

### (JUROR MALONEY)

THE COURT: Do you have any idea or suspicion about the reason for this questioning?

JUROR MALONEY: No, I have to admit it seemed—I was curious in my own mind as to why, because it is probably not the normal. It probably does not happen in most cases.

### (JUROR PATTERSON)

THE COURT: Do you have any idea or suspicion about the reason for this questioning of you?

JUROR PATTERSON: No. I was alarmed about it yesterday because I could tell you were upset and it apparently was one of the jurors, and I didn't know what was behind all that.

THE COURT: Which juror would that have been that you thought I might have been upset about?

JUROR PATTERSON: That would have been Joe, the tall man.

[The juror identified was Joe Leoni, the extortionist.]

THE COURT: Do you think this questioning has been occasioned by any out-of-court misconduct by the prosecution or any of the defendants?

JUROR PATTERSON: I can't say, Judge, one way or the other on that.

### (JUROR MATT)

THE COURT: Do you have any idea or suspicion about the reason for this questioning of you?

JUROR MATT: No, not exactly. I noticed you were a little upset as we left yesterday. You seemed rather angry as you dismissed us.... We said, "He's mad at us. What did we do?"

THE COURT: Do you think this questioning has been occasioned by any out-of-court misconduct by the prosecution or any of the defendants?

JUROR MATT: I wouldn't know about that.

One juror responded unequivocally that she *did* believe that misconduct by a party had occasioned the court's questioning:

THE COURT: Do you think this questioning has been occasioned by any out-of-court misconduct by the prosecution or by any of the defendants?

JUROR ANDERSON: Now repeat that over again.

THE COURT: (Repeats question)

JUROR ANDERSON: Yes, I think there is.

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process." *Irvin v. Dowd*, 366 U.S. at 722, 81 S.Ct. at 1642. Given the quoted responses of the jurors to the court's inquiries—particularly juror Anderson's—we cannot say that the government has carried its burden of dispelling the presumption of prejudice. It seems likely that at least one of the jurors believed misconduct had occurred, despite the trial court's assurance to each juror that there had been no misconduct,[7]

---

7. Following each juror's response to his inquiry about out-of-court misconduct by a party, the court assured the juror that the questioning had not been occasioned by any such miscon-

and we think it is obvious that a juror would more likely attribute misconduct to a criminal defendant than to the United States Government. "If a single juror is improperly influenced, the verdict is as unfair as if all were." *Stone v. United States*, 113 F.2d at 77. *See United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 58, 54 L.Ed.2d 74 (1977). Accordingly, while we appreciate that the trial judge found himself between the Scylla of no voir dire and the Charybdis of voir dire that creates prejudice where none existed, we hold that the motion for mistrial should have been granted.

■■■ We emphasize that we do not adopt a *per se* rule requiring that a mistrial be declared whenever jury taint originates from within the jury itself. In such situations the government has the burden of showing that the tainted juror did not influence others. We see no reason, however, why the presumption of prejudice should be conclusive. The trial court should have discretion to hold a special voir dire, as was done here, or to let the jury proceed to a verdict and then question the jurors. Each approach has its disadvantages. Questioning during trial entails the risk, as seen here, that the questioning itself will suggest defense misconduct and thereby result in prejudice. Post-verdict questioning, while avoiding this risk, may result in irremediable prejudice to the government. For if jury prejudice is favorable to the defendant and a tainted acquittal results, the double jeopardy clause precludes retrial of the defendant. Either procedure may, on the other hand, serve effectively to rebut the presumption that the jury has been prejudiced by the removed juror or the attendant disturbance, and thus avoid the waste of time and expense that a mistrial entails.

Finally, we observe that although thousands of jury trials occur each year, our research has uncovered no other instance in which a juror has attempted to extort money from a party in return for a favorable vote. Happily, it should be extremely rare for a trial court to again be confronted with a motion for mistrial based on such unusual circumstances as occurred in this case.

REVERSED.

SKOPIL, Circuit Judge, concurring:

I agree with the majority that the facts in this case reveal a sufficiently substantial likelihood of prejudice that a new trial is warranted. The district court, in a difficult situation, attempted to eliminate any possibility of prejudice. The responses he received from the jurors revealed that the jury was tainted. There was evidence that the jury had discussed the case prematurely, giving juror Leoni the opportunity to convince others to vote for acquittal. The jurors' statements also showed that they believed the voir dire was necessitated by misconduct on the part of one of the parties. Because of these responses, a new trial was required. I believe that a narrower rule than that apparently announced by the majority would satisfactorily decide this case and would be more consistent with other decisions. I therefore write separately.

I do not think that this case can be evaluated in terms of a presumption of prejudice. As this court has recently stated:

"In questions about jury incidents, we are ultimately not so concerned with their nature as with the prejudice they may have worked on the fairness of the defendants' trial. *See United States v. Klee*, 494 F.2d 394 (9th Cir.), *cert. denied*, 419 U.S. 835, 95 S.Ct. 62, 42 L.Ed.2d 61 (1974); *Cavness v. United States*, 187 F.2d 719 (9th Cir. 1951). Thus, having been presented with facts establishing a jury irregularity, whether or not we speak in terms of the rebuttable presumption of prejudice or of the fairness of defendants' trial, we reach the same result.

---

duct. We think it unlikely that the court's assurance was sufficient to dispel any doubts created by the inquiry. "The influence that lurks in an opinion once formed is so persistent that it unconsciously fights detachment from the mental processes of the average man." *Irvin v. Dowd*, 366 U.S. at 727, 81 S.Ct. at 1645.

In reviewing decisions on jury incidents, we recognize that the District Court is in a better position than we are to determine whether what happened was prejudicial. *United States v. Klee.* For this reason, we accord some deference to its decision when applying the abuse of discretion standard."

*United States v. Armstrong,* 654 F.2d 1328, 1332 (9th Cir. 1981).

This approach is consistent with other recent decisions. The majority correctly notes that in *United States v. Ferguson,* 486 F.2d 968 (6th Cir. 1973) the Sixth Circuit held that dismissal of a tainted juror before deliberations does not eliminate the presumption of prejudice. The peculiar facts in that case clarify and explain this conclusion. It was clear in that case that one, and perhaps two, of the jurors had been tainted by contact with the excused juror. Both of these jurors were permitted to stay on the jury and deliberated on the verdict. 486 F.2d at 969–70. In excusing the juror, the district court specified that the reason for the juror's dismissal was contact with one of the defendants. *Id.* at 969. The judge's explanation thereby raised the spectre of misconduct on the part of one of the defendants. The court made clear that removal of the contacted juror "before he had the opportunity to discuss the case with other members of the panel would be some evidence that no prejudice occurred." *Id.* at 971. Of course removal of the tainted juror would not completely eliminate the need to inquire into the fairness of the defendant's trial because the jury could have been tainted by the judge's remarks, as well as by the tainted juror's.

This more limited reading of *Ferguson* appears consistent with the Sixth Circuit's more recent decision in *United States v. Brown,* 571 F.2d 980 (6th Cir. 1978). In that case, an improperly contacted juror was excused before deliberations began. 571 F.2d at 989. In *Brown,* unlike *Ferguson,* the circumstances justified the district court in believing the jurors' assurances that they had not discussed the case. *Id.* at 990–91. The district court did not dismiss the tainted juror "in a way that would arouse any suspicions that there had been an improper attempt to influence the jury." Whatever presumption of prejudice arose was therefore rebutted. *Id.* In terms of the analysis prescribed by *Armstrong,* the dismissal of the tainted juror in *Brown* did not obviate the district court's responsibility to ensure that the rest of the jury was not tainted. The court properly questioned the improperly contacted juror. Based upon the tainted juror's statements, the district court did not abuse its discretion in deciding not to interrogate the other jurors. Because the court's explanation for replacing the tainted juror did not improperly influence the jury that deliberated on the verdict, Brown received a fair trial.

This view is also consistent with *United States v. Forrest,* 620 F.2d 446 (5th Cir. 1980), *aff'd after remand,* 649 F.2d 355 (5th Cir. 1981). In that case, an improperly contacted juror was excused before deliberations. 620 F.2d at 456. The Fifth Circuit remanded the case for a hearing on whether prejudicial material reached the jury. *Id.* at 458–59. The court did not hold that any presumption of prejudice arose. The court apparently concluded that no presumption of prejudice arises at all unless one of the jurors deliberating on the verdict is impermissibly contacted. 649 F.2d at 356–57. In terms of the *Armstrong* analysis, the district court was obligated once again to determine whether the defendant was denied a fair trial because improper material reached the jury deliberating on the verdict. The possibility that such extraneous material reached the jury necessitated this inquiry. Since the responses the district court received revealed that no improper material reached the jury, the district court was held not to have abused its discretion in denying the defendants' request for a new trial.

In light of *Armstrong, Forrest,* and *Brown,* I would hold that in cases where an impermissibly contacted juror is excused before deliberations begin, the district court is obligated to determine whether the jurors deliberating on the verdict were also improperly contacted. The district court has discretion in determining what sort of investigation is necessary to uncover possible improper contact. The particular facts of

each case will determine how extensive an investigation is warranted, and whether the court can believe a juror's assurances. *See, e.g., United States v. Brown, supra,* 578 F.2d at 990–91. We will only reverse the district court's conclusion for an abuse of discretion. If the district court's investigation reveals that no improper material reached the jurors deliberating on the verdict, a declaration of mistrial is not warranted.

Because the facts of this case reveal that several of the jurors deliberating on the verdict were tainted, a declaration of mistrial was required. This is not because of any heavy presumption of prejudice which arises when an improperly contacted juror deliberates on the verdict, as happened in *Remmer v. United States,* 347 U.S. 227, 228, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954). Rather, the necessary investigation revealed that the defendant did not receive a fair trial because its results showed a taint. I would therefore reverse the judgment of the district court but on the narrower ground which is consistent with the prior decisions of this and other courts.